## MASTER ROYALTIES CORPORATION ET AL. v. MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 203, September Term, 1963.]

78

*Decided May 27, 1964.*

*Motion for rehearing filed June 23, 1964, denied June 24, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and SYBERT, JJ.

*Ward B. Coe, Jr.,* with whom were *G. C. A. Anderson, Louis Hoffman* and *Anderson, Coe & King* on the brief, for the appellants.

*Martin B. Greenfeld, Assistant City Solicitor of Baltimore,* with whom were *Joseph Allen, City Solicitor,* and *George W. Baker, Jr., Deputy City Solicitor,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellee, the City of Baltimore (the City) instituted condemnation proceedings in furtherance of an urban renewal plan to acquire the leasehold interests owned by the appellants in the land and improvements at 208-210 McMechen Street, Baltimore. The trial court entered a judgment of condemnation in favor of the City, which awarded damages of $38,250 to the owners of these leaseholds for the taking thereof. The owners appeal.

The appellants' contentions cover a wide range, including: alleged invalidity of the taking and of the ordinance under which the City purported to act (Ordinance No. 912, approved July 3, 1961) by reason of asserted violations of provisions of the State or Federal Constitutions, or both; alleged conflict with State statutes; alleged conflict with provisions of the Baltimore City Charter; questions as to waiver of jury trial and as to issues which should have been submitted to the jury if there were not such a waiver; and a procedural objection because the City Department of Assessments did not join in these condemnation proceedings.

The present specific provisions of the State Constitution relating to urban renewal in and by the City are contained in Article XI-B, as proposed as a constitutional amendment by Ch. 162 of the Acts of 1947. Under this Act, the amendment, if adopted, was "to supersede and stand in the place and stead of the [then] title to, and Sections 1 and 2 of, Article XIB of [the] Constitution." It was ratified at the election of November 2, 1948, and was certified by the Secretary of State as having been so ratified on January 4, 1949, and is therefore sometimes referred to as the 1949 Amendment.

Under Section 1 of Article XI-B the General Assembly of Maryland may authorize and empower the City to acquire land and property of every kind within its limits by purchase, condemnation, or other lawful means "for development or rede-

80

velopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof"; and to sell, lease, convey, transfer, etc., any of such land or property, whether or not developed or redeveloped. No property may be taken by the City through the power of eminent domain for any of these purposes or in connection with the exercise of any of the powers which may be granted to the City under Article XI-B, without just compensation as agreed upon between the parties or awarded by a jury being first paid or tendered. This section further provides that "All land or property needed, or taken by the exercise of the power of eminent domain, by the [City] for any of the aforementioned purposes or in connection with the exercise of any of the powers which may be granted to the [City] pursuant to this Article is hereby declared to be needed or taken for a public use."

Section 2 of Article XI-B authorizes the General Assembly to grant to the City "any and all additional power and authority necessary or proper to carry into full force and effect any and all of the specific powers which the General Assembly is authorized to grant to the [City] pursuant to this Article and to fully accomplish any and all of the purposes and objects contemplated by the provisions of this Article, provided such additional power or authority is not inconsistent with the terms and provisions of this Article or with any other provision or provisions of the Constitution of Maryland." The General Assembly is also authorized to place restrictions or limitations on the exercise of powers which it may grant to the City under this Article.

Section 3 provided for continuing in existence the previously established Baltimore Redevelopment Commission and for its continued exercise of power and authority which might then or thereafter be vested in it "until such time as such power and authority * * * is validly repealed by an Act of the General Assembly * * * or by an ordinance or resolution of the [City] and a new agency of the [City] is created to carry out the objects and purposes for which the Baltimore Redevelopment Commission was originally created; and nothing contained in this Article shall be taken or construed to the contrary."

Ch. 217 of the Acts of 1949 of the General Assembly in gen-

eral implements Article XI-B, and in large measure grants powers of urban renewal to the City in the terms of that Article. It does this (by Sec. 1 of the Act) by adding a new Paragraph designated as 14(A) to Sec. 6 of the Baltimore City Charter (1946 Ed.). It also contains some specific provisions not spelled out in Article XI-B, but evidently regarded as within the additional powers and further restrictions provisions of Sec. 2 of that Article. Among these are provisions (sub-par. (f)) authorizing the insertion of appropriate provisions in any legal instrument pertaining to the sale, lease, conveyance, transfer or other disposition of property for any of the purposes contemplated by Paragraph 14(A), to the effect that standards of population density, property maintenance, types of land use and other standards established for the particular parcel of land or property shall be maintained, and that all covenants and restrictions contained in any such legal instrument shall be binding upon subsequent purchasers, lessees, transferees or successors.

Sub-paragraph (g) of Par. 14(A) authorizes the City to vest jurisdiction or authority "to exercise or perform" all or any of the powers granted under Par. 14(A) in any suitable board or commission, etc. then existing or thereafter created, and authorizes the City to create a board or commission, etc., for such purposes.

Sec. 2 of Ch. 217 repeals the former Paragraph (25) of the City Charter, entitled "Redevelopment Commission," and all amendments thereof (specifically including Ch. 504 of the Acts of 1947), and Sec. 3 implements Sec. 3 of Art. XI-B by providing in substance that the Redevelopment Commission shall continue in existence and may exercise its powers until it is dissolved by an ordinance of the City and the power and authority granted to the City under Ch. 217 are vested in whole or in part in a new board, commission, department, bureau or other agency of the City. It closes with the provision that "nothing contained in this Act shall be taken or construed to the contrary."

City Ordinance No. 692, approved December 31, 1956, which amended Article 14 of the Baltimore City Code, among other things, abolished the Baltimore Redevelopment Commission and

established the Baltimore Urban Renewal and Housing Agency (BURHA). It also contained a finding that there existed in the City slum, blighted, deteriorated, or deteriorating areas, which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and general welfare of the residents of the City; and it defined the meaning of a slum, blighted or deteriorated area and the meaning of a deteriorating area. In general, it authorizes BURHA to exercise the powers conferred upon the City by Article XI-B and by Ch. 217 of the Acts of 1949, subject in some respects to approval by the Planning Commission, and subject to the approval of renewal plans by City Ordinance to be adopted only after a public hearing. A renewal plan is defined as meaning "a plan, as it exists from time to time, for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof." Such a plan must contain a land use map showing the proposed use of all land in the area and must set forth other matters, including any zoning changes and the effective date thereof, and the nature of any restrictions, conditions or covenants to be incorporated in deeds or contracts for the sale, lease, use or redevelopment of property within the area affected. (City Code, Art. 14, sec. 9-D(b).) Zoning changes require approval by an ordinance in conformity with the procedural requirements of Article 66B of the Code, the State Zoning Enabling Act, and approval by ordinance of a renewal plan constitutes authorization to BURHA to acquire by condemnation, if necessary, land and improvements and interests therein designated for acquisition in the plan. (See City Code, Art. 14, sec. 9E(d) and (e).)

Ordinance 912, among other things, approves a renewal plan for Project I of the Mount Royal-Fremont Renewal Area, this being the plan here involved, and specifically authorizes the condemnation of the fee simple interest in numerous properties, including 208 and 210 McMechen Street, in which the appellants have leasehold interests. The plan contemplates the immediate acquisition of roughly 40% of the area covered by Project I, and makes provision for the subsequent acquisition of other properties if necessary to bring them up to standards

required by other City ordinances or regulations or the additional housing standards contained in sec. 4 of Ordinance 912 or to eliminate incompatible or nonconforming uses. Other matters pertaining to this ordinance and relevant to contentions here raised will be referred to in considering particular contentions.

Sections 28 and 53 of the City Charter relate, respectively, to the title and form of ordinances and to participation by the Bureau of Assessments in condemnation cases and will be further considered in connection with the contentions to which they are directly related.

We shall first take up the appellants' contention that this condemnation proceeding is invalid because of alleged non-compliance with the provisions of Sec. 53 of the City Charter that "[c]onsistent with the provisions of the Charter * * *, the Department [of Assessments], pursuant to the provisions of applicable ordinances as now or hereafter enacted, shall: * * * (5) in conjunction with the Department of Law, institute and carry on all condemnation proceedings on behalf of the City." [1] It is clear that the Department did not initiate or carry on the present proceeding, but we do not find this a fatal objection to the validity thereof. In the first place, it is at least doubtful that this provision, according to its own terms, has any application to the present case where, under Sec. 14(A)(g) of the City Charter, as enacted by Ch. 217 of Acts of 1949, the City may vest jurisdiction or authority in any suitable board, * * * department * * * or other agency to exercise the powers conferred by section 14(A), which include the power of condemnation, and the City has authorized BURHA to exercise this power. Even if applicable, which we do not decide, we think it directory, rather than mandatory. It was so held by Judge Byrnes in the Superior Court of Baltimore City in *Mayor & City Council of Baltimore v. Gilmor*, decided May 19, 1954

---

1. This provision originated in the 1946 Charter when the Commissioners for Opening Streets were abolished and their condemnation functions were transferred to the Department of Assessments. See General Comments prefacing "Preliminary Draft of Charter, June 1945," pp. v-vi.

(Docket 1953, Folio 1012, File No. 31598), where he said: "* * * this requirement is merely directory, especially in redevelopment projects, where the contribution of the Department of Assessments could not be substantial." Cf. *Flaccomio v. City of Baltimore,* 194 Md. 275, 281, 71 A. 2d 12. Cf. also *Marchant v. Mayor & City Council of Baltimore,* 146 Md. 513, 126 A. 884. We note that here no prejudice whatever to the appellants is shown as a result of the non-participation of this Department in the proceedings. A similar situation existed in the cases just cited.

The appellants' first attack on the constitutionality of Ordinance 912 and the taking thereunder is that they are claimed to go beyond the authorization of the present Article XI-B, which is the 1949 Amendment. That Amendment superseded the original XI-B, which was proposed by Ch. 649 of the Acts of 1943, and was ratified at the November, 1944 election, and is referred to below as the 1944 Amendment. The appellants point out that prior to the 1944 Amendment, provisions for taking by eminent domain in Baltimore City were governed by Secs. 40 and 40A of Article III of the Maryland Constitution and that the test of "public use" under those sections was and is use *by* the public, rather than use *benefiting* the public. See *Perellis v. Mayor & City Council of Baltimore,* 190 Md. 86, 57 A. 2d 341 (1948) ; *Riden v. Philadelphia, B. & W. R.R.,* 182 Md. 336, 35 A. 2d 99 (1943). We think that the 1944 and 1949 Amendments embody a broader concept of public use, and it is clear that under the express language of each the power of eminent domain may be exercised by the City (if authorized by the General Assembly) to acquire property for redevelopment, the provisions of the later amendment being somewhat broader. Such provisions of the State Constitution could not be unconstitutional unless they were in conflict in some way with the Federal Constitution, a matter which we shall refer to below.

The appellants' effort to show that Ordinance 912 and the taking thereunder go beyond the authorization of Article XI-B rests largely upon the contention that Sec. 3 of the 1949 Amendment limits the purposes of that Amendment to those of the 1944 Amendment. This contention is based upon the provisions

of Sec. 3 under which the Baltimore Redevelopment Commission [the creation of which was permitted under the 1944 Amendment] may continue in existence and may exercise the powers now or hereafter vested in it until its power and authority are repealed by the General Assembly or by an ordinance or resolution of the City "and a new agency of the [City] is created to carry out *the objects and purposes for which the Baltimore Redevelopment Commission was originally created;* and nothing contained in this Article shall be taken or construed to the contrary." (Italics supplied.) The appellants argue that the 1944 Amendment authorized condemnation only in slum or blighted areas and that Sec. 3 of the 1949 Amendment imposes a like limitation upon the otherwise broader terms of that Amendment.

We find this argument wholly untenable. The fundamental reason for our rejection of it is that the 1949 Amendment was obviously intended to change and broaden the 1944 Amendment. The appellants' contention would render these broadening changes in scope of Article XI-B utterly nugatory and meaningless. Sec. 3 is simply a saving clause to provide for continuity and transition, not a clause to nullify changes otherwise made by the Amendment.

Returning to the main question of public purpose, we refer again to the provisions of Sec. 1 of Article XI-B to the effect that all property needed or taken by eminent domain for purposes authorized by that Article is "declared to be needed or taken for a public use." This, we think, plainly indicates that the Article sets up a standard of what constitutes public use which is not limited to the test stated in the *Riden* case. In *Herzinger v. City of Baltimore,* 203 Md. 49, 98 A. 2d 87, a contention was made that the provisions of Article XI-B (the 1949 Amendment) were "so sweeping as to authorize a taking for any purpose, whether public or not." In answering this contention Judge Henderson said first that: "The words 'development or redevelopment, including but not limited to, the comprehensive renovation or renewal thereof' [i.e., properties acquired], might well be construed, in the light of their general acceptation, as importing a public purpose." (203 Md. at 61.) It was found unnecessary to construe those words in that case,

because the ordinances under which the City was there proceeding sufficiently indicated a public purpose and set up adequate standards to guide the administrative body in exercising the powers conferred, citing as to the latter question *Matthaei v. Housing Authority,* 177 Md. 506, 9 A. 2d 835.

The appellants here set up rather similar contentions to those in the *Herzinger* case. Ch. 217 of the Acts of 1949 was also there relied upon by the City, but the ordinances were different from those here involved. We think, however, that the principles established by the *Herzinger* and *Matthaei* cases are applicable here; and here, too, it seems unnecessary to determine finally that the construction of Article XI-B suggested in *Herzinger* is the correct one, because the applicable provisions of the City Code enacted by Ordinance 692, the provisions of Ordinance 912 and the evidence in this case show that the urban renewal plan here under attack is for a public purpose. We think that the taking is clearly within a proper and valid authorization of Article XI-B (even if, as the appellants contend, the terms of Article XI-B with regard to public purpose are broader than they should be) and of Ch. 217 of the Acts of 1949.

The definition of a "slum, blighted or deteriorated area" contained in Sec. 8(e) of Article 14 of the City Code as enacted by Ordinance 692 is in part as follows:

> "an area in which a preponderance of the structures therein is detrimental to the public health, safety, or general welfare by reason of age, dilapidation, depreciation, overcrowding, excessive land coverage, faulty arrangement, lack of ventilation or sanitary facilities, failure to conform with the provisions of the ordinances or regulatory codes of the City of Baltimore relating to building, housing, or sanitation, neighborhood obsolescence or deterioration, inadequate open space, parking, or access to transportation; or in which there is a preponderance of defective or inadequate street layouts, or of faulty lot layouts in relation to size, adequacy, accessibility or usefulness, or of unsanitary or unsafe conditions, or of deteriorated or inadequate site improvements or community facilities,

or of conditions which endanger life or property by fire or other cause or which retard development of the area, or any combination of these factors; * * *"

Ordinance 912 is closely correlated with Ordinance 692. It recites in the second clause of the preamble that under Ordinance 692 BURHA was authorized to prepare Renewal Plans and to undertake Renewal Projects in Renewal Areas, in the third clause that BURHA has prepared such a Plan for Project I of the Mount Royal-Fremont Urban Renewal Area (which Area had been designated as a Renewal Area by City Ordinance No. 875, approved May 22, 1957), and in the fourth clause the Planning Commission had approved and recommended the Renewal Plan prepared by BURHA. Sec. 1 of Ordinance 912 identifies and approves this Plan, and Sec. 9 contains a waiver of compliance with some provisions of Ordinance 692.

The testimony of Mr. Singh, who is the Principal Planner at BURHA and the head of the Project Planning Division, showed that there was excess coverage of land by buildings, that the area which the City was acquiring was "heavily dilapidated and blighted," that in many cases walls were cracked, that there was excessive crowding in dwelling units, and that there was "improper street layout for the kind of new developments we have today." It was his opinion that the area met the definition of a slum, blighted or deteriorated area under Ordinance 692. His testimony was supported by reports of building inspections which classified 524 of the 787 structures inspected in the Mount Royal-Fremont Development Area as deficient. The evidence warranted the trial court's finding that the area was a slum, blighted or deteriorated area. We think that the development or redevelopment of this area, including but not limited to the comprehensive renovation or rehabilitation thereof constitutes a public purpose within the meaning of both Article XI-B of the State Constitution and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

The Due Process Clause of the Fourteenth Amendment does embody a requirement of a public purpose where a taking by a

State under the power of eminent domain is involved. *Missouri Pacific Railway Co. v. Nebraska*, 164 U. S. 403. The "public purpose" requirement in condemnation cases has been recognized in a number of other decisions of the Supreme Court, and in most of them it has been found to have been met. See *Fall Brook Irrigation District v. Bradley*, 164 U. S. 112, 158 (decided two weeks before the *Missouri Pacific* case) ; *Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U. S. 226, 236; *Clark v. Nash*, 198 U. S. 361, 367-68; *Hawston v. Danville & W. Ry.*, 208 U. S. 598, 607; *O'Neill v. Leamer*, 239 U. S. 244; *Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Power Co.*, 240 U. S. 30, 32; *Milheim v. Moffat Tunnel District*, 262 U. S. 710, 719; *Thompson v. Consolidated Gas Co.*, 300 U. S. 55, 78, 80 (holding invalid a state gas proration order serving a private, and not a public, purpose and providing no compensation). In the *Mt. Vernon-Woodberry* case Mr. Justice Holmes made it clear that the test of use by the general public is inadequate as a universal test by which to determine whether there is a public purpose.

We think that the requirement of a public purpose for the exercise of the power of eminent domain which the Due Process Clause of the Fourteenth Amendment imposes upon the States is no more rigorous than the requirement of public use imposed by the Fifth Amendment upon the Federal Government's exercise of the power of eminent domain. *Berman v. Parker*, 348 U. S. 26 (decided about a year after our *Herzinger* case) seems to us controlling as showing that a taking in furtherance of a genuine urban renewal plan dealing with problems similar to those existing in the instant case, is a taking for a public purpose. Whether or not that case would justify the condemnation for redevelopment or renewal of large areas in which housing facilities cannot be regarded as substandard in any important respect other than the aesthetic, we do not think that it can properly be read as limited to its facts, which seem to be somewhat stronger than those of the instant case. See Dunham, *Griggs v. Allegheny County* [2] *: Thirty Years of Supreme Court Expropriation Laws*, 1962 Sup. Ct. Rev. 63. See

2. 369 U. S. 84.

also *Burt v. City of Pittsburgh,* 340 U. S. 802; *U. S. ex rel. T. V. A. v. Welch,* 327 U. S. 546.

The language of Ordinance 692 is broader than that of the statute involved in *Berman v. Parker, supra,* but is very similar to that of the Pennsylvania statute upheld, without discussion of any Federal constitutional problem, in *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 54 A. 2d 277. The same statute was involved in *Burt v. City of Pittsburgh, supra,* in which the judgment was affirmed per curiam on the authority of *U. S. ex rel. T. V. A. v. Welch, supra.*

The appellants make a further contention based upon alleged violation of the Equal Protection Clause of the Fourteenth Amendment which is coupled with another said to be based on the Due Process Clause. The appellants point out that only about 40% of the properties in the Project Area are to be condemned at the outset, that not all of the blighted properties are to be taken at least at the start, that there is no showing that commercial properties to be taken differ in condition or situation from those not to be taken, and that there is no legislative finding that the area is a slum, blighted or deteriorated area. A renewal plan necessarily involves planning, and planning of the redevelopment of a city area involves the planning of streets to serve it. The absence of a specific legislative finding is, we think, covered by what we have already said as to public purpose and the evidence adduced at the trial. It is also plain, we think, that it is scarcely practicable to redevelop all of the 925 acres in the Mount Royal-Fremont Urban Renewal Area at once, nor are we presently persuaded that it is necessary to condemn at once all of the properties within a smaller Project Area, if the rehabilitation of properties not initially condemned can be effected when necessary by other means or through later takings. Whether or not some of these contentions might have merit in other circumstances, the short answer to them here is that the properties in which the appellants are interested are to be taken for the purpose of widening a street as a part of the renewal plan. We find nothing unreasonable or invidiously discriminatory in that.

It is not a bar to the taking here that the appellants' property located in a slum, blighted or deteriorated area is not it-

self dilapidated, *Herzinger v. City of Baltimore, supra; Berman v. Parker, supra.*

The appellants contend that Ordinance 912 is invalid under Sec. 28 of the City Charter by reason of defects in its title and because it undertakes to amend another ordinance (No. 692) simply by reference to its title.

Sec. 28 of the City Charter contains a provision, which reads as follows:

"Every ordinance enacted by the City shall embrace but one subject, which shall be described in its title * * *".

Because of the similarity of this provision to Sec. 29 of Article III of the State Constitution relating to Acts of the General Assembly, cases dealing with one are pertinent to the other.

The appellants claim that Ordinance 912 contravenes this section in three ways: (A) by attempting to effect zoning changes, though the title disclaims doing so; (B) by failing to give notice that additional properties not initially condemned may later be taken; and (C) by giving inadequate and conflicting descriptions of the Project Area in the title and body. We shall assume, without deciding, that the appellants have standing to raise these contentions.

Objections (B) and (C) merit little comment. The title begins by describing the ordinance as "approving a renewal plan for Project I of the Mount Royal-Fremont Renewal Area; authorizing the acquisition by purchase or by condemnation by the [City] for urban renewal purposes of the fee simple interest or any lesser interest in and to certain properties or portions thereof situate in Baltimore City, Maryland, within the area bounded generally by Laurens Street, McMechen Street, Brevard Street," and six other named streets. With regard to objection (C), reference to the third "Whereas" clause of the preamble and to the Project Area Boundary plat attached to the Renewal Plan approved by the ordinance shows that Park Avenue should have been listed in the title between Laurens Street and McMechen Street as one of the bounding streets. Its omission from the title certainly makes the description there given inaccurate, but we think that the title is nevertheless sufficient to inform readers of the general location of the area and thus to put them on notice, if interested in the general area,

to read the ordinance and examine the plan for the detailed provisions thereof. See *Jacobs v. Klawans*, 225 Md. 147, 155, 169 A. 2d 677; *Pressman v. State Tax Comm.*, 204 Md. 78, 91-92, 102 A. 2d 821.

*Jacobs v. Klawans, supra*, is also relevant with regard to objection (B). The fact that the title states that certain properties are to be acquired suggests that others are not to be, at least currently; and the fact that the title also shows that a renewal plan for the entire Project Area is proposed would lead anyone interested to suppose that other properties in the area are to be affected by the plan and to suggest that he read the whole ordinance to learn just how they are or may be affected. It is firmly settled that a title need not give an abstract of the act or ordinance nor a statement of the means by which it is to be effected. *Prince George's County v. Donohoe*, 220 Md. 362, 367; 152 A. 2d 555; *Allied American Mutual Fire Ins. Co. v. Commissioner of Motor Vehicles*, 219 Md. 607, 150 A. 2d 421; *Neuenschwander v. Washington Suburban Sanitary Comm.*, 187 Md. 67, 79-80, 48 A. 2d 593.

Contention (A), that Ordinance 912 effects zoning changes while its title claims that it does not is based upon the proposition that the land use provisions set forth in the Renewal Plan and indicated on the land use map annexed to it are in substance zoning regulations. Hence, although the appellants concede that it is literally true that Ordinance 912 does not amend the Zoning Ordinance, and that the statement in the title "that the approval of the said renewal plan is not an enactment of any of the amendments to the zoning ordinance proposed therein" is also literally true (since the Renewal Plan itself contemplates a separate ordinance for that purpose), they contend that this statement is deceptive and renders the title bad and the ordinance void.

This contention ignores the fact that Ordinance 912 does not stand alone in splendid isolation. As we have already noted, it is closely correlated with Ordinance 692. That ordinance enacted secs. 8 to 9L of Article 14 of the City Code, entitled "Housing," under the sub-title "Urban Renewal." Sec. 9-D(b) thereof, as we have also noted, defines a Renewal Plan and requires (we here quote one of its provisions in full) that "The

plan shall include a land use map showing the proposed use of all land within the area to which the plan is applicable, including the location, character, and extent of the proposed public and private ownership." Land use, we think, is at least one of the prime considerations with which an urban renewal plan is reasonably sure to be concerned. That sec. 9-D(b) further expressly requires that the renewal plan set out zoning changes, if any, and the effective date thereof, indicates that land use provisions and zoning provisions are not synonymous and coterminous, though zoning is a form of land use regulation.

We think that the term "renewal plan" is used in its urban renewal sense under Article 14 of the City Code and that, since under sec. 9-D(b) thereof a renewal plan must include a land use map showing the proposed use of all land to which the plan is applicable, the statement in the title that the ordinance approves a renewal plan is of itself sufficient to indicate that the ordinance pertains to land use, and to suggest to anyone interested that he examine the ordinance and the renewal plan therein referred to and thereby approved to ascertain the details. (It is not argued, and we think it could not be successfully argued, that anything in the title or body of Ordinance 912 indicated that compliance with the land use map requirement of Ordinance 692 was waived by Ordinance 912.) See the cases above cited with regard to contention (B) under sec. 28 of the City Charter. We are here considering only the validity of the title, not the validity of the land use provisions themselves. We shall speak of that matter later in considering the appellants' standing to challenge their validity.

The last ground of the appellants' attack on Ordinance 912 under sec. 28 of the City Charter is based upon that portion of it which states that "no ordinance shall be revived, amended or enacted by mere reference to its title, but the same shall be set forth at length as in the original ordinance." The trial court found that in most instances the provisions of Ordinance 912 waiving compliance with Ordinance 692 were of no consequence and that Ordinance 912 and the plan were complete in virtually all respects required by Ordinance 692. The trial court was further of the opinion that Ordinance 692 might be superseded

in some or all respects by Ordinance 912. Without intimating disagreement with these views, we think it unnecessary to pass upon the merits of this contention of the appellants, since we think they have no standing to raise it. We are of the opinion that this is also true with regard to the appellants' contentions (a) that Ordinance 912 violates the State Zoning Enabling Act, (b) that the land use plan and the additional housing standards adopted by Ordinance 912 go beyond the authorization granted by the Redevelopment Enabling Act, Ch. 217 of the Acts of 1949, and (c) that there is an unconstitutional delegation of legislative power to BURHA because of the lack of adequate standards to guide its exercise. To avoid repetition we shall endeavor to state our views as to all of these matters together.

The sole interest which the appellants assert here is in the leasehold interest or interests in the property at 208-10 Mc-Mechen Street, and all of their interest therein is being condemned under the specific terms of Ordinance 912, sec. 2. Whatever may be the deficiencies or defects of that Ordinance (i) with regard to the accurate description of the Project I area, (ii) with regard to the description or determination of properties to be acquired other than the properties specifically listed in the Ordinance, or (iii) the conditions under which they may be condemned, (iv) with regard to the land use provisions of the plan as applied to property to be acquired initially or to other property in the Project Area, (v) with regard to additional housing standards sought to be imposed on properties in the Project Area, (vi) with regard to the delegation of powers to BURHA, (vii) with regard to conflict with the State Zoning Enabling Act, or (viii) with regard to the waiver of some provisions of Ordinance 692, none of them affect the appellants' interests. All of their property in the Project Area is being taken for a public purpose and just compensation must be paid for it. Once their property has been condemned and paid for, the various matters which we have enumerated in this paragraph may affect the interests of other persons in other properties in this Project Area, but the appellants will have no interest to be affected thereby. They, therefore, have no standing to challenge directly Ordinance 912 or the taking thereun-

der on any of these grounds. *McBriety v. City of Baltimore,* 219 Md. 223, 148 A. 2d 408; *Simpson v. County Board of Appeals for Montgomery County,* 218 Md. 222, 146 A. 2d 37.

The appellants seek to escape from their difficulties with regard to standing by a flank attack. They contend that someone else can attack the Ordinance successfully as to the land use plans and as to the additional housing standards, that such attacks will reduce the area in which these provisions of the plan are operative to only 40% of the Project Area, consisting of the properties to be initially condemned, that without the other 60% the public purpose of the plan will fail, and thus the appellants' property will have been taken not for a public purpose, but for no purpose at all. They contend that if the Planning Commission and the City Council had known this, they would not have approved the plan or ordinance, and that the severability clauses of the plan and of the ordinance will therefore not save them.

Sec. 2 of Ordinance 912 expressly calls for condemnation of the property in which the appellants are interested (as well as many others). If the whole ordinance can be struck down, sec. 2 will, of course, fall; but in order to strike it down, the appellants must overcome the separability clause. To do this, they must show both that provisions which they attack are void, and that without those provisions or some of them, the rest of the ordinance would not have been enacted. See *Heubeck v. City of Baltimore,* 205 Md. 203, 107 A. 2d 99; *Mayor & City Council of Baltimore v. A. S. Abell Co.,* 218 Md. 273, 145 A. 2d 111. This, we think, they have not done.

Without going into the matter *in extenso,* we think that their contention that the land use regulations and additional housing standards called for by the plan and ordinance go beyond the authorization of the Redevelopment Enabling Act, Ch. 217 of the Acts of 1949 (Sec. 6, Par. 14 A of the City Charter) is without merit. It is true that this Act repealed the power formerly conferred on the Baltimore Redevelopment Commission, on its own authority alone and without approval by any other body, to "determine and define for each Redevelopment Area proper densities of population, land uses, land coverage and standards and limitations upon physical structures * * *." All

such matters are obviously proper matters to be dealt with in a renewal plan. The effect of Ch. 217 of the Acts of 1949, as a whole, on power to deal with these matters was to transfer control from the agency alone (at least after the Redevelopment Commission was dissolved) to the agency (now BURHA), subject to approval by the Planning Commission and ultimately—before such regulations can take effect—by the City Council, whose approval by an ordinance of any renewal plan must be obtained.

As to when, whether or how far land use regulations and additional housing standards can be made effective beyond the 40% of the area to be initially condemned and as to whether the standards are proper or sufficient for BURHA to exercise condemnation powers over other properties, we are not convinced that the ordinance would not have been passed if these provisions were invalid as to any property in the area not acquired by the City. Zoning Ordinance changes were, at all events, contemplated by both the ordinance and the plan. We see no basis for holding void the authority conferred upon BURHA to acquire additional properties by purchase; and if the provisions for acquisition by condemnation proved legally unavailable, we think that the Council could well have determined to make a start at carrying out the plan for this area by condemning the properties therein listed. (It could, we suppose, amend the ordinance later, if necessary, to carry the plan through.) For an urban renewal case in which a separability clause was applied, where condemnation provisions were upheld without determining the validity of housing code provisions of a statute, see *People ex rel. Gutknecht v. Chicago*, 3 Ill. 2d 539, 552-53, 121 N. E. 2d 791.

The appellants' remaining contentions grow out of the fact that the trial court awarded a jury trial to the condemnor, but decided the questions of public purpose and necessity for the taking itself without submitting them to the jury. In this we think the trial court was correct. *Lustine v. State Roads Comm.*, 217 Md. 274, 142 A. 2d 566; *Potomac Electric Power Co. v. Birkett*, 217 Md. 476, 143 A. 2d 485; *Johnson v. Consolidated Gas Elec. Lt. & Power Co.*, 187 Md. 454, 50 A. 2d 918; *State*

*Roads Comm. v. Franklin,* 201 Md. 549, 95 A. 2d 99. We note that the only question which Article XI-B requires to be submitted to the jury is the issue of just compensation.

Whether this issue should have been so submitted or the right to a jury trial was waived by the failure of either party to demand it seems to make no real difference in this case. It is well established in other condemnation cases under other, but similar, provisions that a jury trial can be waived. *Steuart v. Baltimore,* 7 Md. 500; *Ridgely v. Mayor & City Council of Baltimore,* 119 Md. 567, 87 A. 909. This is recognized by our present Maryland Rule U 15 b (Eminent Domain) which became effective after this case was tried. The appellants' contention that a jury trial was waived is based upon Rule 545 of the Supreme Bench of Baltimore City under which failure of either party to file a timely election of jury trial operates as a waiver of the right to jury trial "in all civil" cases in the law courts of Baltimore City. This rule rests upon the rule making power vested in the Supreme Bench by Const., Art. IV, sec. 39.

There is at least one other case in which another Judge of the Supreme Bench took the view that a jury trial could be waived in a condemnation case but that it required an express waiver (not merely inaction under Rule 545) to do so.

Whether a jury trial was or was not effectively waived in this case, we think that no prejudice to the appellants is shown by having a jury trial thrust upon them. If they had been denied a jury trial to which they were constitutionally entitled, a showing of prejudice might be unnecessary; but here we think a showing of prejudice would be requisite. This court ordinarily does not reverse a judgment for a non-prejudicial error. Here, not only is no prejudice shown by the appellants' record extract or appendix, but there is nothing in it about the amount of damages, nor is any argument advanced to show why a jury could not fairly assess damages, nor is there any claim in the appellants' brief that damages were inadequate.

> *Judgment affirmed; the appellants to pay the costs.*