MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

v. JACK O. CHERTKOF, TRUSTEE

[Misc. No. 4, September Term, 1981.]

*Decided March 3, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Richard K. Jacobsen, Chief Solicitor,* with whom were *Benjamin L. Brown, City Solicitor, Ambrose T. Hartman, Deputy City Solicitor,* and *James B. Murphy, Assistant Solicitor,* on the brief, for appellant Mayor and City Council of Baltimore and by *John Henry Lewin, Jr.,* with whom were *Christopher R. Mellott* and *Venable, Baetjer & Howard* on the brief, for appellant Anchor-Hocking Corporation.

*M. Albert Figinski,* with whom were *Arnold M. Weiner* and *Melnicove, Kaufman & Weiner* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

The United States District Court for the District of Maryland, pursuant to Maryland Code (1980 Repl. Vol.), § 12-601 of the Courts and Judicial Proceedings Article, has certified for our determination the following questions of State law:[1]

> 1. Where Baltimore City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purpose of enlarging a public park, but also has, as a primary purpose, the conveyance of part of the condemned property to a different industry for expansion purposes, is such action prohibited by the Baltimore City Charter, Article II, § 15A (a) "Industrial and Economic Development"?
>
> 2. Where Baltimore City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purpose of enlarging a public park and has, as only an incidental and secondary purpose, the conveyance of

---

1. Section 12-601 authorizes this Court to answer questions of State law certified to it, *inter alia,* by a federal district court where the question "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the Court of Appeals of this State."

part of that condemned property to a different industry for expansion purposes, is such action prohibited by the Baltimore City Charter, § 15A (a) "Industrial and Economic Development"?

3. Pursuant to Article II, § 15 (a) "Land Development and Redevelopment," of the Baltimore City Charter, may the City, by ordinance, designate a renewal area authorizing condemnation of private industrial property for a public park, where the City also has, as a primary purpose, the conveyance of a portion of the condemned property to a different industry for expansion purposes?

4. Pursuant to Article II, § 15 (a) "Land Development and Redevelopment," of the Baltimore City Charter, may the City, by ordinance, designate a renewal area authorizing condemnation of private industrial property for a public park, where the City also has, as only an incidental and secondary purpose, the conveyance of a portion of the condemned property to a different industry for expansion purposes?

5. Where Baltimore City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purpose of enlarging a public park, but also has, as a primary purpose, the conveyance of part of the condemned property to a different industry for expansion purposes, is such action prohibited by Article II, § 2 of the Baltimore City Charter?

6. Where Baltimore City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purposes of enlarging a public park and has, as only an incidental and secondary purpose, the conveyance of part of the condemned property to a different industry for expansion purposes, is such action prohibited by Article II, § 2 of the Baltimore City Charter?

7. Where the City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purpose of enlarging a public park, but also has, as a primary purpose, the conveyance of part of the condemned property to a different industry for expansion purposes, has Article XI-B of the Maryland Constitution been violated?

8. Where the City, by an ordinance describing a "Renewal Plan," proposes to condemn private industrial property for the purpose of enlarging a public park and has, as only an incidental and secondary purpose, the conveyance of part of the condemned property to a different industry for expansion purposes, has Article XI-B of the Maryland Constitution been violated?

9. May Baltimore City, pursuant to Article II of the Charter of Baltimore City, lawfully under State and City Law, pass an Ordinance designating certain land within the City as a "Renewal Area," and commanding the City to acquire certain private property within this "Renewal Area" by condemnation, where the primary purpose in passing the Ordinance and commanding the land acquisition thereunder is to assure compatible land uses within the "Renewal Area" itself and not to cause industrial or economic growth for either the City or for a particular private corporation, although a secondary purpose is to achieve either or both of the latter and it is planned that a part of the condemned land will be sold to the adjoining industrial landowner for expansion purposes?

10. Under the Maryland Constitution, the Acts of the General Assembly, and the City Charter, may the City take by condemnation, through an ordinance which on its face purports to be an urban renewal plan, an industrial site and then convey part of that property to another industry if the trier

of fact determines that the City's agents, servants and employees included the industrial site to be taken in an urban renewal ordinance because Section 15A of Article II of the City Charter prohibited the use of the power of eminent domain for industrial and economic growth?

The statement of relevant facts accompanying the certification discloses that Jack O. Chertkof is the legal owner as trustee of an eleven-acre tract of land bordering the Middle Branch of the Patapsco River in South Baltimore; part of the land is under long-term lease to a Maryland corporation which operates a concrete batching plant on the property. Anchor-Hocking Corporation (A-H) operates a glass manufacturing plant upon a parcel of land contiguous to the Chertkof property. On December 5, 1979, Chertkof filed a civil action in the federal district court against the Mayor and City Council (the City) and A-H, alleging a conspiracy between the defendants to deprive him of the trust property in violation of the Due Process Clause of the Fourteenth Amendment. Redress was sought by way of monetary damages and injunctive relief under 42 U.S.C. § 1983 for claimed deprivations of federal rights under color of state law.[2]

According to the averments of the complaint, A-H sought to purchase the Chertkof property in 1977 to expand its manufacturing operations but Chertkof refused to sell for the proposed price; that thereafter A-H conspired with City officials to have the Chertkof property included as a part of the City's Middle Branch urban renewal project; that in pursuance of the conspiracy, the City agreed to utilize its power of eminent domain to condemn the Chertkof property and

---

**2.** 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

later sell part of it to A-H to expand its industrial operations; that on July 27, 1979 the City enacted the Middle Branch urban renewal ordinance (the ordinance) which encompassed acquisition by purchase or condemnation of the Chertkof property, along with other properties included in the renewal area; and that shortly thereafter steps were initiated by the City leading to the property's acquisition through condemnation.

The complaint alleged that the ordinance violated § 15A (a) of Article II of the Baltimore City Charter (1964 revision), which prohibits exercise of the City's condemnation power to acquire property "for or in connection with the industrial and economic growth of Baltimore City." This section was violated, Chertkof contended, because the City intended to condemn his property solely to enable A-H to expand its industrial operations and enhance its economic growth in South Baltimore.

In moving to dismiss the complaint, the City and A-H asserted that the urban renewal ordinance was enacted under § 15 (a) of Art. II of the Charter, which empowers the City to acquire property by condemnation "for development or redevelopment, including but not limited to, the comprehensive renovation or rehabilitation thereof." The City claimed that the urban renewal ordinance for Middle Branch was consistent with this provision of the Charter because its stated purpose was to establish a renewal area in order to rehabilitate and encourage recreational development in that part of the City. The use of its power of condemnation for urban renewal purposes under § 15 (a) is not limited, the City and A-H argued, by the eminent domain prohibition contained in § 15A. The district court denied the motion to dismiss but certified the questions of State law heretofore outlined, concluding that "the Maryland courts have never interpreted the City Charter provisions in this case."

(1)

Article XI-B of the Maryland Constitution entitled "City of Baltimore — Land Development and Redevelopment" (ratified in 1948) provides in § 1 (a) that the General Assembly of Maryland, by public local law, may authorize the City:

> "To acquire, within the boundary lines of Baltimore City, land and property of every kind . . . by purchase, . . . *condemnation* or any other legal means, for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof." (Emphasis supplied.)

Section 1 (b) of the Article authorizes the legislature to empower the City, *inter alia,* to sell or otherwise dispose of property so acquired, regardless of whether it has been developed or redeveloped, to any private or public entity. Section 2 of Art. XI-B authorizes the General Assembly to grant the City additional powers necessary to carry into effect the specified development and redevelopment powers; the section also provides, by way of limitation, that the General Assembly may restrict the exercise of any of the powers granted to the City by Art. XI-B.

The General Assembly, by ch. 217 of the Acts of 1949, generally implemented Art. XI-B by adding to the City Charter what is now § 15 of Art. II, thereby granting "in large measure . . . powers of urban renewal to the City in the terms of that Article." *Master Royalties v. Balto. City,* 235 Md. 74, 80-81, 200 A.2d 652 (1964). Section 15 (a) authorizes the City to condemn property "for development or redevelopment," not limited to the "comprehensive renovation or rehabilitation thereof." Section 15 (b) authorizes the City to develop or redevelop the property so acquired. Section 15 (c) authorizes the City, *inter alia,* to sell any property condemned under § 15 (a), regardless of whether it has been developed or redeveloped, to any private or public entity "for development or redevelopment, including, but not limited to, the comprehensive renovation or rehabilitation thereof." Section 15 (f) authorizes the City to

restrict the use of the property so acquired through binding covenants and to impose controls thereon governing such things as population density, property maintenance, and types of permissible land uses. Section 15 (g) directs the City to designate one of its agencies to exercise and perform the powers so authorized by the provisions of the section.

The agency so designated by the City was the Department of Housing and Community Development (the Department). *See* Baltimore City Code (1976 ed.), Art. 13 (Housing and Urban Renewal), § 20 *et seq.* The provisions of Article 13 recite in extensive detail the dire consequences to the public interest caused by slum, blighted, deteriorated and deteriorating areas in the City. The Article outlines with specificity the broad governmental powers vested in the Department to acquire, develop, redevelop, renovate and rehabilitate properties within the affected areas.

In pursuance of these powers, the Department prepared an urban renewal plan for Middle Branch, which included acquisition of the Chertkof property. After delineating the boundaries of the area involved, the plan specified that its object was to rehabilitate and redevelop the renewal area "respecting [its] historical heritage . . ., encouraging park and recreational development in the area, providing public access to the water's edge, providing open space, continuing — on an orderly basis — industrial uses compatible with recreational uses within the project area, resolving parking deficiencies, creating new opportunities for viable economic development, and protecting the area from blighting influences." The plan specified that four privately owned properties and one City-owned property were to be acquired and made subject to disposition. The western portion of Chertkof's property, which was zoned industrial and upon which the concrete batching plant was located, was designated for industrial use. The eastern portion of the Chertkof property (about five acres) and three other properties, two of which contained auto junkyards, were designated for use as a public marina. The remaining property was designated for use as a public park. The plan encompassed a mixture of

industrial and public uses, with industrial uses being limited to twenty-three in number, including glass manufacturing — the industry in which A-H is engaged. Under the plan, the permissible industrial uses are limited to those "compatible with the proposed recreational facilities," and manufacturing operations are permitted only where they occur "entirely within structures which block public view of such activities . . . ." The plan sets forth detailed regulations, controls and restrictions pertaining to properties in the renewal area, together with specifications governing the redeveloper's obligations, development rights and the like. The plan recited that properties to be acquired in the renewal area were either for clearance and redevelopment, for rehabilitation, for public facilities or some combination of these purposes. Upon acquisition of the properties in the renewal area, the plan directed the Department either to demolish the structures thereon and dispose of the land for redevelopment, sell or lease the property subject to rehabilitation, or rehabilitate and thereafter dispose of it in accordance with applicable regulations.

The plan was implemented by enactment of the Middle Branch urban renewal ordinance. The ordinance stated that it was "the basic goal of the City . . . to encourage recreational development in the [Middle Branch] area, provide public access to the water's edge, and to maintain industrial uses compatible with recreational uses in the project area." It specified that under Art. 13 of the Baltimore City Code, the Middle Branch area was "in need of undertakings and activities for the elimination, the correction, or the prevention of the development or the spread of slums, blight, or deterioration." The ordinance declared that it was necessary to acquire by purchase or condemnation, for urban renewal purposes, the five properties designated in the Department's plan, and it incorporated within its operative provisions the details contained in the urban renewal plan prepared by the Department.

(2)

Our cases have recognized the authority of the City, acting under Art. XI-B and § 15 of the Charter, to undertake urban renewal projects to renovate slums and to prevent blight and deterioration in urban areas in the public interest. *See Donnelly Adv. Corp. v. City of Balto.,* 279 Md. 660, 370 A.2d 1127 (1977); *Free State Realty v. City of Balto.,* 279 Md. 550, 369 A.2d 1030 (1977); *Master Royalties v. Balto. City,* 235 Md. 74, 200 A.2d 652 (1964); *Herzinger v. City of Baltimore,* 203 Md. 49, 98 A.2d 87 (1953). We have recognized that the City's condemnation authority for urban renewal purposes under these provisions embodies a broad concept of public use, not limited to actual use by the public, but rather to use benefitting the public. *Master Royalties, supra; Herzinger, supra.* We have said that "a taking in furtherance of a *genuine* urban renewal plan . . . is a taking for a public purpose." *Master Royalties, supra,* 235 Md. at 88 (emphasis added). We have also said, in considering the legality of an urban renewal ordinance, that "the fact that after the taking the property may be put into private hands does not destroy the public character of the taking insofar as that taking may accomplish a proper public benefit." *Herzinger, supra,* 203 Md. at 60.

It is elementary, of course, that government cannot use its power of eminent domain to condemn property for the private use and benefit of another. *Missouri Pac. Ry. Co. v. State of Nebraska,* 164 U.S. 403, 17 S. Ct. 130, 41 L. Ed. 489 (1896); *Riden v. Phila., B. & W. R. R. Co.,* 182 Md. 336, 35 A.2d 99 (1943); *Van Witsen et al. v. Gutman,* 79 Md. 405, 29 A. 608 (1894). Equally elementary is the principle that when legislation authorizes the acquisition of land by condemnation, the extent and type of taking rests largely in the judgment of the condemnor, and will not be declared unlawful unless it is so oppressive, arbitrary or unreasonable as to suggest bad faith. *Bouton v. Potomac Edison Co.,* 282 Md. 142, 383 A.2d 669 (1978); *Wash. San. Comm. v. Santorios,* 234 Md. 342, 199 A.2d 206 (1964).

Whether the use for which private property is taken is public or private is a judicial question, to be determined by the court; a legislative body cannot make a particular use either public or private by merely declaring it so, *Boswell v. Prince George's Co.,* 273 Md. 522, 330 A.2d 663 (1975); *Prince George's Co. v. Beard,* 266 Md. 83, 291 A.2d 636 (1972); *New Cent. Co. v. George's Creek Co.,* 37 Md. 537 (1873). Where the predominant purpose or effect of a particular condemnation action has been to benefit private interests, we have said that the taking is not for a public use. *Pr. George's Co. v. Collington,* 275 Md. 171, 339 A.2d 278 (1975); *Perellis v. M. & C. C. of Balto.,* 190 Md. 86, 57 A.2d 341 (1948). Conversely, where private use or benefit resulting from the exercise of eminent domain is merely incidental or secondary to the primary public purpose underlying the taking, the condemnation action is not unlawful. *Dobler v. Baltimore,* 151 Md. 154, 134 A. 201 (1926); *M. & C. C. of Balto. v. Brengle,* 116 Md. 342, 81 A. 677 (1911). Judge Eldridge, in *Pr. George's Co. v. Collington, supra,* reviewed for the Court at length numerous cases involving whether a condemnation was for a private or a public use, pointing out that "merely because private businesses or private persons will also receive benefit from the condemnation does not destroy the public character of the action"; and that "the public character of a condemnation is not necessarily changed because a private entity will own the [condemned] property." 275 Md. at 187.

(3)

In considering the certified questions, the City suggests that its primary or secondary purpose for including the Chertkof property in the Middle Branch renewal area is of no importance, as long as it can fairly be said that the public will benefit from the project and that the use made of the property, and the controls imposed thereon, are consistent with the development of the renewal area. The City points out that the Middle Branch renewal plan is essentially a recreational project, with only limited industrial uses

permitted in the project area, which are compatible with the development of the public park and marina.[3] The condemnation of Chertkof's industrially zoned property, upon which the concrete batching plant is operated, is essential to the plan — according to the City — because it is incompatible with a public park and marina located at the water's edge. The City says that disposition of this property to the adjacent glass manufacturing industry, a permitted use under the plan, would greatly benefit the public in terms of increased employment in the area and because of the imposition of strict land use controls on the property. The City further suggests that condemnation of Chertkof's remaining property in the renewal area is crucial to the success of the project because it would be impossible to maintain the integrity of the park and marina and provide a green edge to the waters of Middle Branch without including the property in the plan.

Chertkof maintains that the inclusion of his property in the urban renewal plan and ordinance is but a devious and contrived appendage to a public park proposal in order to break his resistance to the sale of his property to A-H at a price demanded by that corporation. Chertkof urges that we review documents obtained through discovery in the federal action, and which have been included in the record before us, and declare that the threatened taking of his property is unlawful as constituting an effort to accommodate the private need of A-H to expand its industrial operations.

Manifestly, if the Middle Branch ordinance was devised simply as a vehicle to condemn Chertkof's property for the private use of A-H for reasons unassociated with the public purposes underlying urban renewal programs, the taking would not be "in furtherance of a genuine urban renewal plan" and would not therefore be for a public purpose. *Master Royalties, supra,* 235 Md. at 88. It is, however, beyond the purview of the questions of state law certified for

---

3. The City advises that the industrial uses permitted in the project area prior to enactment of the Middle Branch ordinance numbered 198 permissible uses and 27 conditional uses. Under the plan, permitted industrial uses have been reduced to 23.

our consideration to undertake any factual resolution of the merits of the controversy; that determination will be made by the federal district judge in light of all the evidence adduced in the federal proceeding.

## *Certified Questions 1 and 2*

These questions focus upon whether § 15A of Art. II of the City Charter prohibits the City from using its eminent domain powers for urban renewal projects which contain some aspects of industrial or economic growth; and if it does not, whether such projects may embrace, either as a primary or secondary aim, the conveyance of private industrial property to a different private industry for expansion purposes.

Section 15A entitled "Industrial and Economic Development" was added to the City Charter by ch. 433 of the Acts of 1968. It authorized the City in subsection (a):

"To acquire, within . . . [its] boundary lines . . ., land and property of every kind, by purchase, gift, or any other legal means, *but not by eminent domain,* for or in connection with the industrial and economic growth of Baltimore City." [4] (Emphasis added.)

The Act authorized the City in subsection (b) of Art. 15A to sell or lease the property so acquired to any public or private entity for use in connection with the industrial and economic growth or expansion of the City. Subsection (c) required that the City's Board of Estimates, before acquiring the property, determine whether it is needed for industrial and economic growth and whether, if sold or leased, it would be used only for such purposes.

Chertkof maintains that by the enactment in 1968 of § 15A — almost 20 years after § 15 (a) was included in the Charter — the General Assembly intended to limit the

---

4. Chapter 648 of the Acts of 1981 amended § 15A (a) by deleting the limitation on the exercise of the City's condemnation powers in specified instances. The Act provided, however, that the amendment to § 15A (a) would expire on January 31, 1982 and be of no further effect.

breadth of the City's power of eminent domain for urban renewal projects under § 15 (a) so as to exclude therefrom any condemnation for purposes of industrial or economic growth. Accordingly, Chertkof argues that the Middle Branch urban renewal ordinance, insofar as it authorizes condemnation of his property and its disposition for a different industrial use, must yield to § 15A — the later enacted Charter provision. In effect, the argument is that while the City may use its eminent domain powers for urban renewal projects under § 15 (a) to condemn property for "development or redevelopment," nevertheless if the taking is of industrial property and its disposition to another entity may result in industrial or economic growth, it violates § 15A and is therefore unauthorized.

We said in *City of Baltimore v. Clerk,* 270 Md. 316, 311 A.2d 261 (1973) that

> "when two acts of the General Assembly covering similar subject matter make no reference to each other, if it is at all feasible, they will be construed so as to give as full an effect to each other as possible. [cit. om.] In order for one statute to alter or limit another, the intention of the Legislature to do so must be clear and manifest; otherwise, the requirements of one will be construed as embodying the provisions of the other. In such a situation, the second statute will not be considered as a substitute for the first regardless of the order in which they were enacted. [cit. om.]" *Id.* at 319-20.

The reason for the limitation in § 15A upon the City's general condemnation powers under § 2 of Article II of the Charter [5] is not readily apparent from the provisions of the Act. Condemnation for purposes of industrial or economic growth, in some circumstances at least, has been held to constitute a taking for a public use. *See Pr. George's Co. v.*

---

5. Art. II, § 2 of the Charter authorizes the City to condemn "any property . . . of any kind for any public purpose . . . and to acquire property adjoining or near to property to be used for any public purpose. . . ."

*Collington,* 275 Md. 171, 339 A.2d 278 (1975). Whatever the reason, however, nothing in the language of § 15A even remotely suggests an intention on the part of the Legislature to circumscribe the City's broad urban renewal powers under Art. XI-B and § 15. These powers of "development or redevelopment" of blighted or deteriorated parts of the City necessarily include the means to revitalize the affected areas through, *inter alia,* the disposition of acquired properties to public or private entities for purposes and under restrictions compatible with the urban renewal objective. That areas of the City reclaimed by an authorized urban renewal plan may realize a measure of economic and industrial growth in the process is hardly inconsistent with the public purpose underlying urban renewal programs. We glean no clear and manifest legislative intention in § 15A to inhibit condemnations in connection with genuine urban renewal plans even though such takings may implicate some industrial or economic growth. To conclude otherwise would eviscerate thirty years of the City's progress in combating the diseases of 20th century urban America.

We thus answer certified questions 1 and 2 generally in the negative with this important caveat. Although § 15A does not restrict the City's power of condemnation for genuine urban renewal purposes under § 15, even where such a taking may culminate in the disposition of the condemned industrial property to another industrial user for expansion purposes (and result in some industrial or economic growth), nevertheless if the urban renewal plan or a part of it is merely a pretext, a ruse, a contrivance to condemn private industrial property for the private economic enhancement of another industry, as Chertkof claims, the condemnation, as well as the offending segment of the urban renewal plan and ordinance, would be in violation of § 15A. Moreover, if the primary purpose of the urban renewal plan and its implementing ordinance is simply to condemn private industrial property to permit industrial expansion of another industry, and the remainder of the plan is merely incidental or secondary to that primary purpose, § 15A would likewise be violated.

### Certified Questions 3 and 4

These questions focus upon whether § 15 (a) permits the City, as part of an urban renewal plan implemented by ordinance, to condemn private industrial property where a primary or secondary purpose of the condemnation is to convey that property to a different industrial user for expansion purposes.

As we have indicated, the condemnation of property for disposition to another in accordance with a bona fide, genuine urban renewal plan is consistent with the authority vested in the City under § 15. The mere fact that the urban renewal plan has, as a main or secondary objective, the acquisition by purchase or condemnation of a particular industrial property for disposition to a different industry for a use consistent and compatible with the urban renewal plan does not, of itself, render the taking unlawful under § 15 (a). Indeed, as we have noted, the resale of condemned property to private parties has frequently been upheld, so long as the condemnation and disposition is imbued with a public purpose. In addition to *Master Royalties* and *Herzinger,* both *supra, see Flaccomio v. City of Baltimore,* 194 Md. 275, 71 A.2d 12 (1950) (upholding condemnation by City of property which was to be turned over to private museum); *Johnson v. Baltimore,* 158 Md. 93, 148 A. 209 (1930) (condemnation of property to be given to private corporation operating Enoch Pratt upheld); *Marchant v. Baltimore,* 146 Md. 513, 126 A. 884 (1924) (condemnation of shore property on Patapsco River and disposition to private users for comprehensive harbor redevelopment upheld due to economic benefit to public); *Pitznogle v. Western Md. R.R. Co.,* 119 Md. 673, 678-79, 87 A. 917 (1913) (condemnation for benefit of private railroad also inured to public use).

In *Pr. George's Co. v. Collington, supra,* the plaintiff's land was taken under a statute authorizing condemnation for development of a multi-use industrial park to promote industrial and economic growth in the county. The condemned land, after acquisition, was to be sold or leased to private entities pursuant to a comprehensive govern-

mental plan regulating and controlling the development of the industrial park. In concluding that the use proposed by the county for the condemned property was a public rather than a private use, we emphasized two factors: (1) that the particular project could not be carried out by private developers, and (2) that the county, by development covenants, would maintain significant control over the industrial park after the land was sold to private owners. In assessing whether the condemnation was for public use, we determined that the predominant purpose of the project was not to benefit any particular private businesses or persons.

*Berman v. Parker,* 348 U.S. 26, 75 S. Ct. 98, 99 L. Ed. 27 (1954), involved a constitutional challenge to legislation authorizing the government to condemn property in the District of Columbia for purposes of redeveloping substandard housing and blighted areas. The legislation directed that redevelopment be pursuant to a comprehensive plan of land use, designating areas for housing, business, industry, recreation and other public and private uses. It authorized sale of the condemned land to private and public entities for redevelopment with appropriate restrictions and conditions. The appellants, owners of a department store in an area proposed for redevelopment, claimed that it was unconstitutional "to take a man's property merely to develop a better balanced, more attractive community." *Id.* at 31. The Supreme Court, after finding that the condemnation was for a public purpose and that it was lawful, said:

> "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. . . .
>
> "Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. [cit. om.] Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the

means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one business for the benefit of another businessman. But the means of executing the project are for Congress . . . to determine once the public purpose has been established. [cit. om.] The public end may be as well or better served through an agency of private enterprise than through a department of government — or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." *Id.* at 33-34.

The Supreme Court made clear that the government had the power to attack the problem of urban decay and plan for redevelopment on an area-wide basis, *i.e.,* to redesign the affected area as a whole so as to eliminate the conditions that caused the blight and achieve a balanced, integrated plan for the region.

In accordance with the principles outlined in these cases, we answer certified questions 3 and 4 generally in the affirmative, *i.e.,* that under the authority of § 15 an urban renewal ordinance may lawfully command the condemnation of private industrial property for public use in pursuance of a genuine urban renewal plan; and this is so whether or not the City's primary or secondary objective in enacting the ordinance and targeting a particular industrial property for condemnation is to convey a portion of it to a different industry for expansion purposes, so long as the City's action is consistent with the lawful public end intended to be served by implementation of the urban renewal plan. Again, however, we add the caveat that irrespective of the facial legality of the ordinance, if the evidence demonstrates that the exercise of the City's § 15 powers is simply a pretext to condemn private property for the private economic enhancement of another industry, the purpose of such action, regardless of any resulting public benefit, would not be for a public use and the condemnation would be unlawful under § 15 (a).

### Certified Questions 5 and 6

These questions focus on the extent of the City's general condemnation powers under § 2 of Article II of the Charter (*see* footnote 5, *supra*). Since the City has acknowledged in its brief and in oral argument before us that the proposed condemnation in this case is based solely upon the City's condemnation powers under § 15 (a), we need not address certified questions 5 and 6 because, under § 12-601 of the Courts Article (footnote 1, *supra*), the answers would not be determinative of the cause pending in the federal district court. See, however, *Pr. George's Co. v. Collington, supra,* on the scope of the condemnation powers under § 40 of Art. III of the Maryland Constitution.

### Certified Questions 7 and 8

These questions inquire whether Art. XI-B of the Maryland Constitution would be violated where the urban renewal ordinance has, either as a primary or secondary purpose, the condemnation of private industrial property for conveyance to a different industry for expansion purposes. Since Art. XI-B is the constitutional enabling authority underlying enactment of § 15, we answer these questions generally in the negative for the same reasons and with the same caveat as expressed in answering certified questions 3 and 4.

### Certified Question 9

For reasons heretofore stated, we answer this certified question in the affirmative, *i.e.,* that the City, under the powers vested in it by Art. II of the Charter, may enact an urban renewal ordinance for the purpose of condemning designated private property "where the primary purpose in passing the Ordinance and commanding the land acquisition thereunder is to assure compatible land uses within the 'Renewal Area' itself and not to cause industrial or economic growth for either the City or for a particular private corpora-

tion, although a secondary purpose is to achieve either or both of the latter and it is planned that a part of the condemned land will be sold to the adjoining industrial landowner for expansion purposes."

### Certified Question 10

This question focuses upon whether the City is vested with authority to condemn a private industrial site under an ordinance "which on its face purports to be an urban renewal plan ... and then convey part of that property to another industry if the trier of fact determines that the City's agents, servants and employees included the industrial site to be taken in an urban renewal ordinance because Section 15A of Article II of the City Charter prohibited the use of the power of eminent domain for industrial and economic growth."

We answer this question generally in the negative because the City, in so acting in violation of § 15A, would have intentionally misused its condemnation powers under § 15 (a) and a taking thereunder would not, therefore, be in furtherance of a genuine urban renewal plan or consistent with the lawful public purposes which underlie the enactment of § 15.

> *Questions of law answered as herein set forth; costs to be divided one-half as to the appellants and one-half as to appellee.*