739 A.2d 854

## EASTERN OUTDOOR ADVERTISING COMPANY

v.

## MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 1646, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 29, 1999.

Reconsideration Denied Nov. 30, 1999.

Jonathan A. Azrael (Matthew H. Azrael and Azrael, Gann & Franz, on the brief), Baltimore, for appellant.

Sandra R. Gutman, Assoc. Solicitor (Frank C. Derr, Deputy City Solicitor, on the brief), Baltimore, for appellees.

Argued before SALMON, EYLER and HARRELL *, JJ.

HARRELL, Judge.

This appeal from a judgment of the Circuit Court for Baltimore City concerns the denial by the City of Baltimore's

---

* Harrell, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; he

Board of Municipal and Zoning Appeals (the Board) of a conditional use application for a general advertising sign (billboard) within a designated urban renewal district. The applicant for the conditional use permit, Eastern Outdoor Advertising Company (Eastern), sought judicial review of the Board's decision in the circuit court. The Mayor and City Council noted its intention to participate in the proceedings.[1] The circuit court affirmed the Board's denial and Eastern noted this appeal.

## ISSUES

Appellant frames three questions for our consideration, which we have rephrased slightly:

I. Did the circuit court apply an incorrect standard of review in reaching its affirmance of the decision of the Board?

II. Did the Board err as a matter of law in concluding that the proposed general advertising sign is not permitted, as a conditional use, within the Mt. Vernon Urban Renewal Area?

III. Was the evidence before the Board sufficient to render it fairly debatable that the square footage of the proposed double-sided sign exceeded the maximum 900 square feet allowed by the zoning ordinance?

For the reasons explained in this opinion, we reverse.

## FACTS

On or about 24 October 1996, Eastern filed with the Board a

---

participated in the adoption of this opinion as a member of this Court by special designation.

1. The Mayor and City Council of Baltimore are vested by statute with the general powers of zoning and planning within the City of Baltimore. *See* Md.Code (1957; 1998 Repl.Vol.), Art. 66B, § 2.01. The Board is enabled by statute, implemented by the Mayor and City Council, to hear and decide, among other things, conditional use permit applications. *See* Md.Code Art. 66B, § 2.08(c)2; Baltimore City Code (1983 Repl. Vol., 1994 Cum.Supp.), Art. 30, § 11.0–3(b)(1).

combined permit application/appeal (No. 97–97X)[2] seeking permission to erect a new double-faced, illuminated general advertising sign on property, described as 808 Guilford Avenue, owned by 828 Guilford LLC and to be leased by Eastern. Each face of the sign was to be fourteen feet high by forty-eight feet wide. The height of the proposed sign was to be ninety feet.

808 Guilford Avenue was zoned in the B–5–1 Business District. The property was improved with strip commercial buildings housing a laundromat, bail bondsman, two food carry-outs, and a video store. The proposed sign was to be located in the parking lot of the strip center. The sign was intended to be visible to traffic traveling on the adjacent Jones Fall Expressway (I–83).

The lot that contained the existing uses and structures, and was to be the site of the proposed sign, had frontage of approximately 320 feet on the west side of Guilford Avenue (which runs parallel and adjacent to the west side of I–83), covering the entire block between Read Street and Madison Street. The lot also had approximately 162 feet of frontage on Read Street along the lot's northerly boundary and 166 feet of frontage along its southerly boundary on Madison Street. Across I–83 from the subject property was the City Jail and Maryland Penitentiary.

General advertising signs are permitted as conditional uses in the B–5–1 District, provided approval is obtained from the Board and certain criteria are met. Baltimore City Code, Art. 30 (Zoning Ordinance), § 10.3.1(c). A specific criterion applicable to such signs proposed in the B–5–1 District (and which was pertinent to this case) was that the total area of the sign shall not exceed 900 square feet.[3] Moreover, the Zoning

---

**2.** Although the parties do not make it clear in their briefs, it appears that the conditional use permit process for a general advertising sign is initiated by an applicant filing an "appeal" with the Board, even though no prior application appears to have been denied by another official (Zoning Administrator), department, or agency of the City.

**3.** The total area of a sign that is two-sided and each face is the same size is determined to be the square footage of only one side if the two

Ordinance, at § 11.0–5(a), provides, in pertinent part, generally as to any conditional use approval:

11.0–5 Standards

a. *Standards for Conditional Uses.* No conditional use shall be authorized unless the Board finds in each specific case that the establishment, maintenance, or operation of the conditional use will not be detrimental to or endanger the public health, security, general welfare, or morals, and, as a further guide to their decision upon the facts of each case, they shall give consideration to the following, where appropriate:

1. the nature of the proposed site, including its size and shape and the proposed size, shape, and arrangement of structures;

\* \* \*

3. the nature of the surrounding area and the extent to which the proposed use might impair its present and future development;

4. the proximity of dwellings, churches, schools, public structures, and other places of public gathering;

\* \* \*

8. the preservation of cultural and historic landmarks;

9. any Urban Renewal Plan approved by the Mayor and City Council or the Master Plan approved by the Planning Commission;

10. all standards and requirements contained in this ordinance;

\* \* \*

12. any other matters considered to be in the interest of the general welfare.

\* \* \*

---

sides are back-to-back and are at no point separated by spacing greater than two feet apart (Zoning Ordinance, § 13.0–2); otherwise, both faces of a two-sided sign are computed in assessing compliance with this criterion.

The subject property was located within the boundaries of the Mount Vernon Urban Renewal Area. This area, originally recognized in a Renewal Plan for Mount Vernon by the Mayor and City Council in 1964,[4] included the subject property in the far northeastern corner of the area. Included as part of this Renewal Plan (the Plan) was a Land Use Map, referred to in the Plan text (§ C) as Exhibit No. 2. The text of the Plan, at § C(b), purported generally to describe, by reference to the Land Use Map, what "uses . . . will be permitted within the project area [the described Mount Vernon area]." The subject property was depicted on the Land Use Map as "commercial." § C(b), "Permitted Uses," of the Plan text does not mention as such any conditional uses among the uses there addressed (and appearing on the Land Use Map).[5] Likewise, signage as a principal use is not mentioned in the Plan's "Permitted Uses" section. The text of § C(2)(Land Use Plan) of the Plan text otherwise mentions signs as follows:

c. *Regulations, Controls, and Restrictions on Land to be Acquired* [6]

The following regulations, controls, and restrictions will be implemented where applicable by covenants or other provisions in agreements for land disposition and instruments of conveyance . . .

(a) General Provisions . . .

\* \* \*

---

4. Ordinance No. 281, adopted 22 June 1964.

5. Although "Special Exceptions (Physician' and Dentists' Offices)" are referenced in § C(2)(b)(1)(b)(iii) as to Residential Uses, as we have long recognized, the term "special exceptions" as used in the Baltimore City Zoning Ordinance is understood to refer to variances. *See Belvoir Farms Homeowners Ass'n, Inc. v. North,* 355 Md. 259, 276, n. 11, 734 A.2d 227, (1999); *Cromwell v. Ward,* 102 Md.App. 691, 705, 651 A.2d 424 (1995). Conditional uses, as that term is used in the City Zoning Ordinance, refers to what other jurisdictions in Maryland call special exceptions.

6. The Property Acquisition Map that is part of the plan as reproduced in the record of this case appears to be a photo reduction. Regardless, the scale is so small that we cannot determine the status of the subject property. No party claims it is to be acquired.

xi. Signs

\* \* \*

(b) No signs other than those identifying the structure upon which they are installed or identifying the uses conducted therein shall be permitted.

\* \* \*

d. *Duration of Provisions and Requirements*

The land use provisions and building requirements specified in Paragraphs C.2.a., C.2.b., and C.2.c. above shall be in effect for a period of not less than 40 years following the date of the approval of this Plan by the Mayor and City Council of Baltimore.

e. *Applicability of Provisions and Requirements to Property Not to Be Acquired*

The provisions of Paragraph C.2.b (Permitted Uses) above shall apply to all properties not to be acquired within the project area. The provisions of Section C.2.c. shall apply as appropriate to properties not currently proposed to be acquired by this Plan when the owners thereof acquire adjacent project land made available by the Department of Housing and Community Development under the provisions of this Plan.

f. *Signs*

Except as hereinafter provided, beginning at the time of the approval of this Plan by the Mayor and City Council of Baltimore, June 22, 1964, no minor privileges for new signs over the public right-of-way shall be issued within the project area. Except as herein provided no minor privileges for signs over the public right-of-way shall be renewed after three (3) years from the above-mentioned time, except that signs on existing marquees will be permitted to continue.

Minor privilege permits may be issued for signs which do not exceed or project more than twelve inches beyond the building wall proper or for signs existing on April 1, 1967, which are within the limits of show windows or cornices

or which do not extend more than three inches from show windows or cornices into the public right-of-way. Minor privilege permits for signs designed solely to designate a public parking facility may be issued provided such signs do not extend more than five feet from the property line and are not more than four feet in height or width nor more than twelve inches thick. No minor privileges shall be issued for any sign which projects above the top of the vertical wall of the building or for any sign which is flashing, animated, or rotating in any manner.

The frontage along Howard Street from Monument to Madison Streets and the project area south of the north right-of-way line of Centre Street shall be excluded from the provisions of this Section.

Nothing in this Plan shall be construed to permit any sign otherwise prohibited by the laws, ordinances and regulations of the City of Baltimore.

\* \* \*

The Plan text gave special treatment for signs in a portion of the area called the Antique Row Commercial Area.[7] Concerning "Exterior Rehabilitation Standards" for that area, the text provided in pertinent part as to signage:

D.2.c.4(g) No new general advertising signs (billboards and posterboards) shall be allowed within the Antique Row area. Existing general advertising signs shall be terminated within five years.

Finally, the Plan text provides, under § E ("Other Provisions Necessary To Meet State and Local Requirements"), as follows:

2. *Zoning*

All appropriate provisions of the Zoning Ordinance of Baltimore City shall apply to properties in the Mount Vernon Project Area as shown on the Zoning Districts Map, Exhibit No. 5. No zoning changes are proposed as part of this Plan.

---

**7.** The subject property of this case is not a part of the Antique Row Commercial Area.

3. *Reasons for the Various Provisions of this Plan*

a. Planning for Mount Vernon has sought to utilize its many existing diverse strengths. In this area of Baltimore, centering on Mount Vernon Place, a unique concentration of nationally known cultural institutions, fine houses, churches and monuments provides a nucleus around which an attractive and desirable residential neighborhood could grow. Consequently, the Plan emphasizes the retention of existing structures where survey data has revealed that they are basically sound and appropriate for residential use.

b. Clearance and redevelopment is generally located in the eastern portion of the project where deterioration of structures is most prevalent. By this approach, existing concentrations of blight will be removed, future deteriorating influences will be curtailed, and new investment encouraged in the area.

\* \* \*

On 18 November 1997, the Board conducted an evidentiary hearing in this matter. Received into evidence at that hearing, among other things, were a host of memoranda and letters from various City agencies, individual citizens, and historical/cultural groups opposed to Eastern's sign proposal. Most of this opposition, without benefit of elaboration, asserted (among other things) that the Mount Vernon Urban Renewal Plan did not permit on the subject property a general advertising sign of the size and height proposed by Eastern. For example, the City's Department of Housing and Community Development, in two memoranda dated 17 April 1997 and 18 November 1997, opposed the sign because "such a sign is prohibited in the Mount Vernon area by ordinance [meaning the Plan]." The Citizens Planning and Housing Coalition, in a letter dated 17 November 1997, asserted that the Plan prohibited billboards by virtue of their omission from the enumeration of permitted uses. In yet another letter, dated 18 November 1997, a group titled "Renaissance Mount Vernon" implied that unspecified "stringent rules" in "Urban Renewal

Ordinances" and/or "the Commission for Historic and Architectural Preservation" foreclosed such a sign.

Of arguably greater specificity, the Mt. Vernon/Belvedere Association, in its 2 April 1997 letter, stated:

This property is in the Mount Vernon Urban Renewal District. The Ordinance governing this Urban Renewal District specifically lists the uses permitted in the District (see Section C.2. and particularly C.2.b.(3) of the Ordinance). *Billboards* are *not* among the uses permitted by the Ordinance. Furthermore, in the Section dealing with *Signs* (Section C.2.c.(2)(a)xi.(c')), the Ordinance states that any "free-standing single or multi-faced signs [are] not to exceed five (5) square feet" and "The height of such signs above curb level shall not exceed six (6) feet."

The proposed sign is clearly in violation of the provisions of the Urban Renewal Ordinance for Mount Vernon.

(Emphasis in original).

The City's Department of Planning, by memorandum of 17 January 1997, opined:

Staff has concerns about the proposed general advertising sign that relate to its potential disruption to the shopping center on the premises, the proliferation of general advertising signs along the I–83 corridor, and the visual impact of the sign on the Mt. Vernon Historic and Urban Renewal Areas. *Note that billboards are not among the list of permitted uses in the Mt. Vernon Renewal Area.*

● **Location in a shopping center parking lot**

The applicants have not provided a layout for the parking lot that shows the billboard would not take away spaces from what is already a tight parking situation for the existing strip shopping center on the premises. While the applicant has reported to community planning staff that the structure would be located on a traffic island, we have no site plan that demonstrates that. Staff very much opposes any changes that would remove spaces from this parking lot.

● **Proliferation of general advertising signs along I–83**

Staff has an on-going concern about the proliferation of billboards along the Jones Falls Expressway, the major gateway for thousands of commuters and visitors to downtown Baltimore. The southernmost link of I–83 already contains a series of billboards, including locations just north of the Orleans Street viaduct and Gay at Fallsway where there are two (2) billboards at lots across the street from each other.

To the north of the site in question is a large rooftop board designated by the applicants as an "identification sign" that is used to advertise businesses other than the billboard company that owns it. The sign has in recent occasions (spring 1996) announced "Sign it here" and offers an 800 number to do so. Were the users truly occupants of the building, it would appear that the sign owner would not need to post a sign with an 800 number to respond.

We recommended disapproval of an appeal for a billboard at the northeast corner of Gay and Fallsway. The Board chose to approve that appeal, contending that it was not principally viewed from I–83. Staff has found in practice that that 63' high billboard towers over I–83, with far greater visibility from the Interstate highway than from Gay Street. Staff questions the need for a fifth billboard along that south end of I–83 from Guilford at Mt. Royal to Fayette.

● **Visual impact on the Mt. Vernon Historic (and Urban Renewal) Area**

The sign would also have a visual impact on the Mt. Vernon Historic District and Urban Renewal Area, and the Midtown Belvedere Urban Renewal Area, as well as the downtown skyline. The Board has turned down other billboards along I–83 for reasons based on impact on historic districts and vistas, including 400 W. North Avenue. *Furthermore, the Urban Renewal Plan for Mt. Vernon, as noted earlier, does not list [b]illboards as a permitted use.*

(Emphasis supplied).

At the Board hearing, Eastern produced two witnesses, both officers of Eastern. Although not offered as experts in

any particular field, one of those witnesses, Ms. Jean G. Smith, offered the following opinions on direct examination:

Q. Does the sign, and this is item number 9 [copy of the Mount Vernon Urban Renewal Plan], which the Chairman referred to, does the sign interfere with any Urban Renewal plan approved by the Mayor and City Council, or Master Plan for the City approved by the Planning Commission?

A. No, it does not.

Q. I have a copy of the Master Plan dated June 22nd, 1964, approved by the Mayor and City Council which was last amended in 1984 and ask you if you're familiar with that particular plan?

A. Yes, I have examined that plan.

Q. All right. Is there any specific prohibition to a bill-board in the area which is encompassed by the renewal plan, as you have read it?

A. No, there's not.

Q. The only prohibition in fact to the—as a billboard is on Howard Street, I believe, South Howard Street, and Antique Row, is that correct?

A. It's far distant from that.

Q. And how far is the present location from the Antique Row on Howard Street, which is specifically prohibited in the Urban Renewal Plan?

A. About six—about a half mile.

\* \* \* \* \*

Q. Does the sign meet all standards and requirements contained in Zoning Ordinance Number 105–1, and Sections 10.0–3–C and Sections 1.0–5–A?

A. Yes, it does.

Q. Are there any matters of general welfare which would attach to the erection of the sign at this location, is there anything that inhibit in terms of the general welfare of this sign being erected?

A. None whatsoever.

Eastern's other witness, Mr. Kurt Rutherford, also not offered as an expert, identified various photographs of the site, existing general advertising signs along the I-83 corridor in the general vicinity,[8] and the neighborhood, and various sight lines to and from the subject property and surrounding landmarks. Based on his knowledge of the neighborhood and the photographs he took, Mr. Rutherford opined:

A. Well, it's a unique site, there are several high rise buildings along Calvert Street to the west, and they obscure the [proposed sign] completely from Calvert Street, west to the vast majority of the Mount Vernon area.

* * *

Q. Is there any way that this board will be seen from Calvert and Read?

A. Not at all, I tried to shoot exactly where the billboard would be, it would be completely obscured by the building. I was able to get a small piece of the City Jail, thankfully it is several hundred thousands square feet. So I was able to get a small piece of it in there, but the bulletin itself would be completely obscured.

The Board, in deciding the matter, made no findings of fact resolving the evidentiary disputes appearing in the record. Instead, the Board majority was concerned apparently with those portions of the opposition expressed at the 18 November 1997 hearing focused on the Mount Vernon Urban Renewal Plan. The key premise considered by the Board was that the Urban Renewal Plan, because it expressed its land use provisions in terms of a list of what uses were permitted (rather than prohibited), precluded billboards within the Mount Vernon Plan area by not including billboards or outdoor advertising signs expressly on the enumeration of permitted uses, other than as limited in the Antique Row area. Further, the Plan did not acknowledge expressly that such signs could be

---

8. No existing billboard on the same side of I-83 as the proposed sign was closer than 1500 feet to the subject property. If true, this complied with a criterion provided by the Zoning Ordinance for presumably assessing proliferation of such signs.

approved as conditional uses in Business Districts within the Plan area. The representative of the City Planning Department who testified at the hearing, Mr. Thomas Stosur, Community Planner for the Central District (including the Mount Vernon Midtown Area) for the 1-1/2 years prior to the hearing,[9] opined that this was the Department's opinion regarding the Mayor and City Council's intent in adopting the urban renewal plan for the Mount Vernon Area. This opinion by Mr. Stosur was conceded to have been based on a staff interpretation made without consultation with the City's attorneys or any identified intrinsic or extrinsic legislative support.

The second problem area focused on by the Board was the proposed sign face area calculation. According to the Board's Staff Report, the design of the proposed sign showed the two faces of the sign as being separated by a distance of 3-1/2 feet at their closest point and as much as 18 feet apart at their most remote point (in something of a "V" configuration). Accordingly, the area of each sign face (14 feet multiplied by 48 feet = 672 square feet) would be counted in determining compliance with the 900 square foot maximum area permitted by the Zoning Ordinance. By that method, Eastern's proposed sign was alleged to be a total of 1344 square feet.

In the Board's 3 December 1997 written decision disapproving Eastern's application, the rationales of the Board's majority and minority were explained as follows:

> Two members of the Board voted to approve the application, believing that if billboards were intended to be excluded in the Mount Vernon Urban Renewal District, the ordinance would have excluded them in the same way that it excluded signs in the antique row district of the Urban Renewal Plan. However, two members of the Board were in agreement with the Protestants, and were of the opinion that the Urban Renewal Ordinance is a positive ordinance,

---

9. Mr. Stosur indicated that no billboards had been approved in the urban renewal area during this period. He failed, however, to indicate if any had been proposed.

which means that if a use is not specifically listed as a permitted use, that use is not permitted.

The Board, in making its decision to disapprove this appeal, applied the standards for conditional uses under Section 11.0–5a of the Zoning Ordinance, particularly standard number nine which states that the Board must consider any Urban Renewal Plan approved by the Mayor and City Council when determining whether to approve a conditional use.

Based on the report from Planning, and a review of the Urban Renewal Ordinance, the Board was of the opinion that the proposed billboard was not a permitted use in the Mount Vernon Urban Renewal District. The Board also considered the standard set forth in *Schultz v. Pritts*, 291 Md. 1, 21–22, [432 A.2d 1319] (1981), which states that when deciding a conditional use would have an adverse effect and should be denied, the Board must determine whether the facts and circumstances show that the particular use proposed would have a greater adverse effect at the proposed location than it would have if it were located elsewhere within the zone.

In applying that standard to this case, the Board finds that for the reasons stated above, the proposed billboard is not a permitted use in the Mount Vernon Urban Renewal Area and would thus have a far greater adverse impact at the proposed location than it would have if it were placed elsewhere in the B–5 zoning district at a location not designated as part of an urban renewal district.

The Board further finds that under Section 13.0–2(75) of the Zoning Ordinance, the total area of a billboard cannot exceed 900 square feet, the Board is without authority to approve a billboard of this size.

Where the Board lacks the concurring vote of three members of the Board in favor of granting the permit, the application must be disapproved.[10]

---

**10.** The record in this case is silent as to: (1) when the vote was taken on Eastern's application (it was not apparently taken on the public

The circuit court, in affirming the Board's decision, seemingly eschewed positing its decision on the Board's interpretation of the Mount Vernon Urban Renewal Plan as prohibiting Eastern's proposed sign, although it apparently agreed that "advertising signs of the size and height of the proposed sign are not among the listed permitted uses." [11] Instead, the court based its affirmance on the Board's *Schultz v. Pritts* rationale, implicitly assuming the sign would be allowed by the Mount Vernon Urban Renewal Plan if a conditional use approval were otherwise forthcoming. Guided by the *Schultz* standard of "whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a [conditional]

---

record of the 18 November 1997 hearing); or (2) which two Board members voted for approval and which two for disapproval. Our puzzlement in this regard is expressed here because apparently *five* Board members *and* the Board Chairman were present at the 18 November 1997 hearing. Absent some indication of a roll call vote, we are unable to make sense of why only four Board members appear to have voted on Eastern's application.

**11.** Notwithstanding its declination to posit its decision on the permitted use list interpretation, the court, in the "Legal Discussion" portion of its 27 July 1998 Memorandum Opinion and Order, purported to outline its understanding of the relationship between the text of the Urban Renewal Plan and the Zoning Ordinance as to signage:

Chapter 10 [of the City Zoning Ordinance] also states the standards governing the authorization of conditional uses. ORD. § 11.0–5. The Board must find that the conditional use "will not be detrimental to or endanger the public health, security, general welfare or morals." *Id.* at § 11.0–5(a). As a "guide to their decision . . . of each case," the Board is required to consider, when appropriate, certain enumerated items. *Id.* Among these enumerated items is "any Urban Renewal Plan approved by the Mayor and City Council." *Id.* at § 11.0–5(a)(9). The Mount Vernon Renewal Plan ("Plan") identifies certain uses as "permitted within the project area." Plan at §§ C.2.b. *et seq..* The Plan also strictly limits the size and nature of signs permitted within the project area. *Id.* at § C.2.c (2)(a)(xi). Under the Plan, no free-standing sign may exceed a height of six feet and an area of five square feet. *Id.* at C.2.c. (2)(a)(xi)(c'). Also, no sign of any type may exceed a height of 15 feet. *Id.* at C.2.c. (2)(a)(xi)(d').

use irrespective of its location within the [district]" (*Schultz,* 291 Md. at 21–22, 432 A.2d 1319), the circuit court concluded:

In this case, evidence presented to the Board established that the proposed sign would adversely affect residences, churches and historical and preservation uses in the area; there was also testimony that the proposed sign would be a hazard to motorists using the adjacent interstate highway. That evidence provides substantial support for the Board's denial of the application.

(footnote omitted). The court expressly declined to address the sign area calculation issue in view of its disposition of the prior issue.

## STANDARD OF REVIEW

We have held on numerous occasions that a court's role in "reviewing the decision of an administrative agency is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law," e.g., *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 652, 701 A.2d 879 (1997) (citing *Lee v. M–NCPPC,* 107 Md. App. 486, 492, 668 A.2d 980 (1995)). In fulfilling that role, courts recognize two standards of review of a decision of a zoning board: one for the board's conclusions of law and another for the board's findings of fact or conclusions of mixed questions of law and fact. When reviewing the board's legal conclusions, the court "must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law." *Id.* When reviewing findings of fact and conclusions regarding mixed questions, however, the circuit court "cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record." *Id. See also Friends of the Ridge v. Baltimore Gas and Elec. Co.,* 120 Md.App. 444, 465, 707 A.2d 866 (1998), *vacated in part,* 352 Md. 645, 724

A.2d 34 (1999); *People's Counsel for Baltimore County v. Prosser Co., Inc.,* 119 Md.App. 150, 167–68, 704 A.2d 483 (1998); *Colao v. Prince George's County,* 109 Md.App. 431, 457–58, 675 A.2d 148 (1996); *Columbia Road Citizens' Assoc. v. Montgomery County,* 98 Md.App. 695, 698, 635 A.2d 30 (1994). If a court finds no substantial or sufficient evidence to support the factual findings of the Board, the Board's decision will be reversed because it was arbitrary and illegal. *See Mossburg v. Montgomery County,* 107 Md.App. 1, 30, 666 A.2d 1253 (1995).

 We have also explained that:

The substantial evidence standard applicable to the Board's findings of fact and resolution of mixed questions of law and fact, sometimes referred to as the "fairly debatable" test, is implicated by our assessment of whether the record before the Board contained at least "a little more than a scintilla of evidence" to support the Board's scrutinized action. If such substantial evidence exists, even if we would not have reached the same conclusions as the Board based on all the evidence, we must affirm. Stated another way, substantial evidence pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion. Of course, on pure questions of law, we extend no deference to the Board (or the circuit court for that matter) beyond the weight merited by the persuasive force of the reasoning employed.

*Friends of the Ridge,* 120 Md.App. at 466, 707 A.2d 866 (emphasis omitted). "The role of this Court 'is essentially to repeat the task for the circuit court; that is, to be certain the circuit court did not err in its review.'" *Red Roof Inns, Inc. v. People's Counsel for Baltimore County,* 96 Md.App. 219, 224, 624 A.2d 1281 (1993) (citing *Art Wood Enters. v. Wiseburg Community Ass'n,* 88 Md.App. 723, 728, 596 A.2d 712 (1991)). Furthermore, our scope of review is a narrow one. This Court "may not substitute our judgment for that of the [board], assess the weight and credibility of that evidence, make specific findings of fact, and then draw and articulate

conclusions of law therefrom. A reviewing Court may not uphold the agency order unless it is sustainable *on the agency's findings and for the reasons stated by the agency."* *Colao,* 109 Md.App. at 463, 675 A.2d 148 (emphasis added in original) (citations omitted).

## I.

▆▆▆ Eastern contends that the circuit court did not apply the correct standard of review in upholding the Board's decision to deny the conditional use permit. It argues that the circuit court exceeded its authority by making wholly independent factual findings, not stated or relied upon by the Board, rather than confining its review to the Board's express findings and conclusions for denying the permit. We agree with appellant.

As presented *supra,* the Board's "findings" and rationale for its decision contained no true findings of fact. To the contrary, the Board resolved no patent factual dispute regarding billboard proliferation, visual impact, traffic safety impact, loss of parking spaces, or any other site specific public health, safety, and welfare issue in the record. Instead, the Board based its decision on conclusions of law as to the legal effect of the Urban Renewal Plan vis à vis the City Zoning Ordinance provisions otherwise allowing outdoor advertising signs in B–5–1 Districts as conditional uses.[12]

---

12. To be sure, in discussing the Department of Planning's recommendation to disapprove the application, the Board's decision summarized the report as follows:
> 3. The Department of Planning recommended disapproval of the application because:
> a. The subject property is located in the Mount Vernon Urban Renewal Area and the billboards are not included among the list of uses specifically permitted under Ordinance No. 281, approved June 22, 1964 (the Urban Renewal Ordinance).
> b. No site plan was submitted by the applicant showing that the billboard's location in the shopping center parking lot will not remove parking spaces in this crowded parking lot.
> c. There is on-going concern regarding the proliferation of billboards along the Jones Falls Expressway. There are presently four signs located in the south end of the expressway from Guilford

In reviewing the Board's decision, the circuit court did not discuss the "findings" of the Board or whether the Board's "findings" were based upon substantial evidence. Instead, the circuit court upheld the Board's denial apparently by sifting through the evidentiary record to find evidence that the billboard might have an adverse impact on "residences, churches and historical and preservation uses in the area", that the sign would be hazardous to motorists using the interstate highway and that these reasons provided "substantial support" for the Board's denial.

■■■ The Board cannot be affirmed for findings of fact that it did not make or rely on as a basis to deny the conditional use permit. *See Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 552–53, 723 A.2d 440 (1999); *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984); *Colao*, 109 Md.App. at 463, 675 A.2d 148. Nowhere in its decision did the Board make any findings of fact regarding the billboard's adverse impact on "residences, churches and historical and preservation uses in the area" or that the sign would be hazardous to motorists using the interstate highway. By making such factual findings independently, the circuit court substituted its own judgment for that of the Board. This the court cannot do. We have previously explained the rationale for confining a court's review only to the administrative body's findings:

> Given express findings, the court can determine whether the findings are supported by substantial evidence, and whether the findings warrant the decision of the board. If no findings are made, and if the court elects not to remand, its clumsy alternative is to *read* the record, *speculate* upon the portions which probably were believed by the board, *guess*

---

Avenue to Fayette Street and Planning questions the need for a fifth billboard in that area.

d. The sign would have a negative impact on the Mount Vernon Historic District and Urban Renewal Area.

Thereafter, however, the Board did not adopt or rely on any of the Department's reasoning, save the substance of 3(a).

at the conclusions drawn from credited portions, *construct a basis* for decision, and *try to determine* whether a decision thus arrived at should be sustained. In the process, the court is required to do much that is assigned to the board, and the latter becomes a relatively inefficient instrument for the construction of a record.

*Gough v. Board of Zoning Appeals,* 21 Md.App. 697, 702, 321 A.2d 315 (1974)(emphasis in original)(quoting 3 R.M. Anderson, American Law of Zoning § 16.41, at 242 (1968)). *Accord Bucktail,* 352 Md. at 556, 723 A.2d 440 (citing to *Gough* ).

## II.

### A.

Appellee urges us to uphold the Board's decision that the conditional use permit be denied because the proposed sign is a prohibited use under the Mount Vernon Urban Renewal Plan. Appellee focuses on the legislative purpose of the Plan which it asserts is to list expressly all of the uses permitted in the District. Any use not listed, appellee claims, is not permitted. Appellee points to § C of the Plan text which enumerates permitted uses in the Urban Renewal District, but does not include billboards, and to Section C.2.c.(1)(a)xi.(b), which provides that "no signs other than those identifying the uses conducted therein shall be permitted." Appellee discerns from these provisions that there is "little doubt of the Legislature's intent to exclude general advertising signs, which, under Section 13.0–2(79) of the Zoning Ordinance is defined as 'a sign which directs attention to a business, commodity, service, event, or other activity which is sold, offered, or conducted elsewhere than on the premises upon which the sign is located'...."

We reiterate at the outset that, on issues of law, we pay no deference to the Board. *See Richmarr Holly Hills, Inc.,* 117 Md.App. at 652, 701 A.2d 879. The threshold issue here is whether, even assuming the organizational structure of the Plan text purportedly operates to prohibit outdoor adver-

tising signs of the size proposed by Eastern, the Plan modifies, negates, or "trumps", as a matter of law, the provisions of the Zoning Ordinance allowing such use as a conditional use generally in the B–5–1 District. The Board found the opposition's view of the Plan to be dispositive as a matter of law in denying the conditional use permit, rather than considering it merely as one of the many factors to be considered as provided by Chapter 11 of the Zoning Ordinance. We believe that the Board's conclusion implicitly equates the adoption of the Urban Renewal Plan with an amendment to the Zoning Ordinance or, alternatively, if the Plan conflicts with, or is more restrictive than, the Zoning Ordinance, the Plan "trumps" the Zoning Ordinance. We conclude that the Board's legal conclusion is erroneous and inconsistent with the Zoning Ordinance, the Renewal Plan, the intent of the Mayor and City Council of Baltimore, and with relevant common law. We hold, therefore, that the Board erred as a matter of law in concluding that Eastern's proposed general advertising sign is prohibited, as a matter of law, within the Mt. Vernon Urban Renewal Area.

 Under the rules of statutory interpretation, we first use the text of the statute or statutes to discern the legislature's intent. *See Gordon Family Partnership v. Gar On Jer,* 348 Md. 129, 137, 702 A.2d 753 (1997). "Where, giving the words of the statute their ordinary and common meaning, the statute is clear and unambiguous, both in meaning and application, it is usually unnecessary to go further." *Id.* at 137–38, 702 A.2d 753 (citations omitted). The Court of Appeals has explained, however, that we

> may and often must consider other 'external manifestations' or 'persuasive evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

*Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628 (1987). Stated differently, documents addressing the same subject matter may need to be read together to find the legislature's intent. *See id.* at 516, 525 A.2d 628. The Court of Appeals has

> made it plain that legislative purpose is critical, that purpose must be discerned in light of context, and that statutes are to be construed reasonably with reference to the purpose to be accomplished. . . . The purpose, in short, determined in light of the statute's context, is the key. And that purpose becomes the context within which we apply the plain-meaning rule. Thus results that are unreasonable, illogical or inconsistent with common sense should be avoided . . . with real legislative intention prevailing over the intention indicated by the literal meaning.

*Id.* (citations omitted).

Our statutory interpretation begins with the Zoning Ordinance itself. Clearly, Chapter 10 of the Zoning Ordinance allows generally for a conditional use permit for general advertising signs in the B–5–1 district (such as the proposed sign location in this case), after consideration of certain factors under Chapter 11. *See* § 10.3.1(c). One of those factors is any relevant urban renewal plan. *See* § 11.0–5. Nowhere in the Zoning Ordinance, however, is an urban renewal plan defined.[13]

In addition to the Zoning Ordinance, it is necessary to interpret ordinances approved by the Mayor and City Council that relate to the Plan at issue. The Mayor and City Council, in determining that urban renewal plans generally were needed to rid Baltimore of slum, blighted, deteriorated, or deterio-

---

13. Several Court of Appeals cases give historical perspectives on urban renewal plans in Baltimore, albeit in the context of the exercise of municipal condemnation powers. *See Mayor and City Council of Baltimore, v. Chertkof,* 293 Md. 32, 441 A.2d 1044 (1982); *Free State Realty Company, Inc. v. Mayor and City Council of Baltimore,* 279 Md. 550, 369 A.2d 1030 (1977); *Master Royalties Corp. v. City of Baltimore,* 235 Md. 74, 200 A.2d 652 (1964); *Herzinger v. Mayor & City Council of Baltimore,* 203 Md. 49, 96 A.2d 3 (1953).

rating areas, approved Ordinance No. 692 on 31 December 1956. Section 9–D of Ordinance No. 692 defines an urban renewal plan:

> (b) As used herein a Renewal Plan means a plan, as it exists from time to time, for the elimination, correction, or the prevention of the development or the spread of slums, blight, or deterioration in an entire Renewal Area or a portion thereof . . . *The plan shall set out zoning changes, if any, and the effective date thereof.* The plan also shall indicate the nature of the restrictions, conditions, or covenants, if any, which are to be incorporated in deeds or contracts for the sale, lease, use or redevelopment of land or property within the area to which the plan is applicable. In addition, the plan shall state the reasons for the various provisions which it contains.
>
> (c) Every Renewal Plan shall conform to the Master Plan or to the Detailed Plan, if any, applicable to the area of the city involved.

(Emphasis added).

Section 9–E(d) of Ordinance No. 692 further states that "[a]ny change in the Zoning Ordinance embodied in a Renewal Plan shall be approved by ordinance in accordance with the procedural requirements of Article 66–B of the Annotated Code of Maryland (1951 Edition) as it now exists or as it hereafter may be amended."Subsequent ordinances set the boundaries for the "Down–Town Urban Renewal Area," which included Mount Vernon within its geographic delineation.[14]

On 22 June 1964, the initial Renewal Plan for Mount Vernon was approved by the Mayor and City Council by Ordinance No. 281. Section 8 of Ordinance No. 281 states: *"And be it further ordained,* That the approval of the Renewal Plan for the Mount Vernon Project by this Ordinance shall not be construed as an enactment of such amendments to the zoning ordinances as are proposed in the said Renewal Plan." (em-

---

**14.** Baltimore, Md., Ordinance No. 1210 (Jan. 24, 1958) and Baltimore, Md., Ordinance No. 1586 (July 9, 1958).

phasis in original). The Mayor and City Council subsequently approved four revisions to the Plan, of which only Ordinance No. 841, approved on 19 July 1978, is pertinent to this case. Ordinance No. 841 adopted the amendment to the Renewal Plan regarding signs which is at the heart of appellee's argument. From the plain language of Ordinance No. 692, Ordinance No. 281, Ordinance No. 841, and each amendment to the Plan we examined, there is no expression of intent that adoption of the Plan amends the provisions of the Zoning Ordinance relating to signs in the B–5–1 zone.

The Court of Appeals, in *Donnelly Advertising Corp. of Maryland v. City of Baltimore,* 279 Md. 660, 665, 370 A.2d 1127 (1977), explained that the approval of an urban renewal plan by ordinance does not automatically amend a pre-existing zoning ordinance. The Court premised its explanation on the notice requirements required by statute before amending the Zoning Ordinance:

> The Oldtown Urban Renewal Plan, as approved by the Oldtown Urban Renewal Ordinance, is first and foremost, as its name indicates, an urban renewal plan. It was properly enacted, according to statutory requirements. That zoning changes are contemplated in the renewal area does not convert the ordinance into a zoning ordinance. The statutory scheme for enacting urban renewal ordinances recognizes the distinction between urban renewal and zoning by providing that "Any change in the Zoning Ordinance embodied in a Renewal Plan ... shall be approved by ordinance in accordance with the procedural requirements of Article 66–B of the Annotated Code of Maryland (1957 Edition)...." Ordinance No. 152, s 25(d). This two-step process, enactment of an urban renewal plan pursuant to notice requirements of Ordinance No. 152 and amendment of the Zoning Ordinance, if necessary, pursuant to Art. 66B, assures that the urban renewal scheme will not be utilized to enact zoning changes.

*Id.*

In the instant case, we find similar safeguards were contemplated by the Mayor and City Council. To avoid covert or

unintended changes to the Zoning Ordinance, Ordinance No. 692, Ordinance No. 281, and Ordinance No. 841 contain notice requirements before amendment of the Zoning Ordinance. These procedural safeguards assure urban renewal plans will not be utilized to enact zoning changes without following proper procedures. *Id.* Absent from Ordinance No. 692, Ordinance No. 281, and Ordinance No. 841 are any indications that the Mayor and City Council intended to use the Plan to amend the Zoning Ordinance as it pertains to signs generally. Furthermore, we have reviewed the Renewal Plan itself and find no provisions that expressly state that the Renewal Plan changes or amends the Zoning Ordinance. To the contrary, § E.2 of the Renewal Plan text, it seems to us, reflects that the Mayor and City Council did not intend the Renewal Plan to amend the Zoning Ordinance: "[a]ll appropriate provisions of the zoning ordinance of Baltimore City shall apply to properties in the Mount Vernon Project Area … No zoning changes are proposed as part of this Plan."

▮▮▮▮ Having determined that the Renewal Plan does not amend the Zoning Ordinance, we next consider what weight the Zoning Ordinance intended be given to the recommendations of an urban renewal plan in the consideration of a conditional use permit application. A plain reading of § 11.05 of the Zoning Ordinance is particularly telling in this regard. Section 11.05 directs the Board to consider a myriad of factors to guide such a decision. One of those factors is "any Urban Renewal Plan approved by the Mayor and City Council or the Master Plan for the City approved by the Planning Commission." We believe that the Zoning Ordinance affords an urban renewal plan recommendation the weight given by other Maryland jurisdictions to the recommendations of a master plan in deciding whether to grant a special exception. *See* n. 5 *supra.*

With regard to master plans, we recently explained in *Richmarr Holly Hills, Inc.* that

[i]n pertinent governmental land use decisions made in Maryland, save those concerning individual or piecemeal

petitions for rezoning, the weight to be accorded a master plan or comprehensive plan recommendation depends upon the language of the statute, ordinance, or regulation establishing standards pursuant to which the decision is to be made. The specific types of governmental land use decisions clearly embraced by the principle are rezonings, special exceptions, and subdivision approvals. In such cases, we look first to the words of the applicable statute, ordinance, or regulation to divine what the enabler intended the weight to be accorded by the ultimate decision-maker to a recommendation of a plan. This becomes largely an exercise in statutory interpretation, with its attendant principles of construction. Secondarily, because the field of inquiry involves the relatively complex area of land use, our predecessors have often looked to the nature and purpose of land use and master planning in order to validate and measure any legal conclusion reached regarding the interpretation of the applicable statute, ordinance, or regulation.

117 Md.App. at 635–36, 701 A.2d 879.

Without question, a plain reading of the City Zoning Ordinance states that the Renewal Plan, like a master plan, is merely a guiding factor, not a dispositive factor, to consider in deciding whether to grant a conditional use permit. "Master Plan guidelines are mandatory only if an ordinance so provides." *Richmarr Holly Hills Inc.*, 117 Md.App. at 640, 701 A.2d 879. We find no such mandate afforded to the Renewal Plan in question in the Zoning Ordinance.

### B.

■ Alternatively, the Board purported to apply a *Schultz v. Pritts* analysis to justify denial of the conditional use permit. In doing so, the Board solely relied on the Department of Planning's recommendation to disallow the use based on its legal determination that "the proposed billboard is not a permitted use in the Mount Vernon Renewal Area and would thus have a far greater impact at the proposed location than it would have if it were placed elsewhere in the B–5 zoning

district at a location not designed as part of an urban renewal district." We conclude that the *Schultz* standard was misapplied in the case at hand.

*Schultz* "remains the standard by which special exception [and conditional use] questions are resolved." *Mossburg*, 107 Md.App. at 8, 666 A.2d 1253. The Court of Appeals and this Court have held repeatedly that a proposed conditional use is prima facie valid absent any fact or circumstance negating the presumption. *See Schultz*, 291 Md. at 11, 432 A.2d 1319; *Richmarr Holly Hills, Inc.*, 117 Md.App. at 644–45, 701 A.2d 879; *Anderson v. Sawyer*, 23 Md.App. 612, 616–17, 329 A.2d 716 (1974). This presumption in favor of conditional uses exists because the legislature made a policy determination that the conditional use is a permitted use provided certain conditions are met. *See Mossburg*, 107 Md. App. at 7–8, 666 A.2d 1253; *Chester Haven Beach Partnership v. Board of Appeals*, 103 Md.App. 324, 336, 653 A.2d 532 (1995). In *Schultz*, the late Judge Rita Davidson explained for the Court that

> [w]hen the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses. Such uses cannot be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses.

291 Md. at 21–22, 432 A.2d 1319 (citations omitted).

In *Mossburg*, Judge Cathell, now on the Court of Appeals, explained for the Court of Special Appeals the role of the administrative body in deciding whether to grant a special exception/conditional use permit allowed by a zoning ordinance:

> [I]t is not whether a special exception/conditional use is compatible with permitted uses that is relevant in the administrative proceedings. The legislative body, by designating the special exception, has deemed it to be generally

compatible with other uses. In special exception cases, therefore, general compatibility is not normally a proper issue for the agency to consider. That issue has already been addressed and legislatively resolved. Moreover, it is not whether a use permitted by way of a special exception will have adverse effects (adverse effects are implied in the first instance by making such uses conditional uses or special exceptions rather than permitted uses), it is whether the adverse effects in a particular location would be greater than the adverse effects ordinarily associated with a particular use that is to be considered by the agency. As Judge Davidson opined in *Schultz:*

> [T]he appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at that particular location proposed would have any adverse effects *above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.*

*Id.* at 8–9, 666 A.2d 1253 (emphasis by the Court)(citing *Schultz,* 291 Md. at 22–23, 432 A.2d 1319).

In *Mossburg,* we reversed the decision of the Montgomery County Board of Appeals denying the applicant's request for a special exception for operation of a solid waste transfer station in the I–2 (industrial) zone. In holding that the findings of the Board and the evidence presented were insufficient to deny the application, we elaborated on the meaning of "adverse effect" in the context of the *Schultz* standard:

> The question in the case *sub judice,* therefore, is not whether a solid waste transfer station has adverse effect. It inherently has them. The question is also not whether the solid waste transfer station at issue here will have adverse effects at this proposed location. Certainly, it will and those adverse effects are contemplated by the statute. The proper question is whether those adverse effects are above and beyond, *i.e., greater here* than they would generally be elsewhere within the areas of the County where they

may be established, *i.e.*, the other few I–2 Industrial Zones. In other words, if it must be shown, as it must be, that the adverse effects at the particular site are greater or "above and beyond," then it must be asked, greater than what? Above and beyond what? Once an applicant presents sufficient evidence establishing that his proposed use meets the requirements of the statute, even including that it has attached to it some inherent adverse impact, an otherwise silent record does not establish that that impact, however severe at a given location, is greater at that location than elsewhere.

*Id.* (emphasis in original)

In the instant case, we direct our attention to whether the Board made findings of adverse effects, based on competent and substantial evidence, sufficient to meet the *Schultz* standard. Absent such supportable findings negating the presumption of validity, the denial of Eastern's conditional use permit would be arbitrary, capricious, and illegal. *See Schultz*, 291 Md. at 11, 432 A.2d 1319; *Mossburg*, 107 Md.App. at 30, 666 A.2d 1253; *Richmarr Holly Hills, Inc.*, 117 Md.App. at 658–59, 701 A.2d 879. Because the Board made no factual findings and offered no valid legal conclusions with regard to the denial of the application, we may not uphold the Board's decision based on its asserted application of *Schultz*. The mere invocation of *Schultz*'s name cannot immunize the Board's decision from reversal.

The Board's conclusion that "the proposed billboard is not a permitted use in the Mount Vernon Renewal Area and would thus have a far greater impact at the proposed location than it would have if it were placed elsewhere in the B–5 zoning district at a location not designed as part of an urban renewal district" is completely unsubstantiated by any factual finding peculiar to Eastern's proposed sign and the surrounding environs. The Board's legal conclusion must be supported by findings of fact, and we have already determined that the Board failed to make such findings. Nowhere in the Board's decision was it determined that the billboard would have specific adverse effects (putting aside the erroneous interpre-

tation of the legal effect of the Renewal Plan) in its proposed location above and beyond those inherent to such a sign as would obtain generally elsewhere in the City within a B–5–1 district. In arriving at this decision we note:

> This Court is not insensitive to the commendable efforts of the City Government to make the downtown and midtown areas of the City a pleasant place to live, work, and recreate. Nor does it ignore or belittle the concerns of those participating in that effort over a proliferation of billboards that, to them, are unsightly. But the Court is not the policy-making arm of the City Government; its function is to interpret and apply the law correctly and to make certain that the other instruments of government do likewise. The City Council, by permitting billboards as a conditional use, has legislatively determined that, as a general rule, they do not menace or endanger the public health, safety, general welfare, or morals within the area of their permitted use. The Board has a limited amount of discretion to deny the use if there is substantial evidence to show that, notwithstanding the underlying legislative conclusion, a particular structure would, in fact, have such an effect. But it may not thwart the legislative will based upon unspecific and unsupported protestations and concerns.

*Mayor and City Council of Baltimore v. Foster & Kleiser,* 46 Md.App. 163, 171–72, 416 A.2d 762 (1980).

### III.

■ Appellee takes great pains to convince us that Eastern's proposed billboard (two back-to-back signs, each face measuring 14 feet by 48 feet, or 672 square feet of area per sign face) violates the Zoning Ordinance. Appellee states that § 10.0–3c requires that "the total area of any sign shall not exceed 900 square feet" and that § 13.0–2(75) requires that:

> Where a sign has two or more faces, the area of all faces shall be included in determining the area of the sign except that, where two such faces are placed back to back and are at no point more than two feet from one another (excluding necessary supports or uprights), the area of the sign shall

be taken as the area of one face if the two faces are of unequal area.

Here, without explanation, the Board, apparently adopting the planning staff report measurements, found that the billboard would be 1344 square feet, far in excess of the 900 square feet maximum requirement.[15] In an attempt to supplement the Board's finding, appellee *post hoc* explains that, using the scale (1" = 200') of the photocopy of the relevant zoning map excerpt in the record on which Eastern drew in freehand a depiction of the proposed sign, the back-to-back signs will be more than two feet apart at some point, and thus Eastern cannot fulfill the requirements of the exception in § 13.0–2(75).[16] According to the zoning map's scale, the proposed separation of the two faces of the billboard is three and one half feet at its narrowest point and eighteen feet at its widest point. Appellee argues that, based on those measurements, the Board correctly concluded that each 672 square foot face of the billboard must be added to calculate the full square footage of the sign in accordance with the Zoning Ordinance. Appellee urges us to uphold the Board's conclusion that it was without authority to grant the conditional use permit. We do not agree.

As stated earlier, we review the Board's findings of fact under the "substantial evidence" or "fairly debatable" standard. *See Richmarr Holly Hills, Inc.*, 117 Md.App. at 651–52, 701 A.2d 879. Under this standard, we cannot sustain the findings of the Board absent substantial evidence, or if reasonable minds could not reach the Board's conclusion based on the record. *Id.* at 652, 701 A.2d 879. We have examined the

---

**15.** As we noted earlier, the circuit court declined to address whether the proposed sign violated the Zoning Ordinance since it found, albeit erroneously, substantial evidence to uphold the Board's decision under the *Schultz* standard.

**16.** There is no dispute that were the two sign faces no more than two feet apart, the total square footage of the sign would be calculated as that of the face of one sign (or 672 square feet), thereby coming within the requirements of the Zoning Ordinance.

record before us and cannot find substantial evidence in the record to sustain the Board's conclusion.

We base our decision upon our determination that the Board's findings and the record are insufficient to permit proper judicial review. *See Bucktail,* 352 Md. at 553, 723 A.2d 440. The Board's findings of fact must be meaningful and cannot be simply broad conclusionary statements. *See Id.* The rationale behind this principle lies in the "fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings." *Id.* (citing *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772 (1991)). We believe the Board's "finding" that the area of the sign was 1344 square feet, and therefore not in compliance with the Zoning Ordinance, to be a mere conclusory statement that fails to advise appellant or us of the facts used to arrive at such a decision. We have no precise idea how the Board reached its conclusion.[17] The absence of factual findings deny appellant its fundamental right to know the reasons for the denial of the conditional use permit. "[I]t is not sufficient for the [Board] simply to express conclusions, without pointing to the facts found by the [Board] that form the basis for its contrary conclusion." *Id.* at 557, 723 A.2d 440. We hold, therefore, that the Board's conclusion that the size of the billboard exceeded the limitations set by the Zoning Ordinance to be arbitrary, capricious, and illegal. *See Schultz,* 291 Md. at 11, 432 A.2d 1319; *Mossburg,* 107 Md.App. at 30, 666 A.2d 1253; *Richmarr Holly Hills, Inc.,* 117 Md.App. at 658–59, 701 A.2d 879.

Furthermore, we cannot accept appellee's *post hoc* rationalizations to cure deficient agency actions. *See Bucktail,* 352 Md. at 557, 723 A.2d 440. Here, the Board did not state in its findings that the two signs were spaced apart by more than

---

17. As we noted earlier, Eastern's witnesses maintained that the proposed sign complied with all standards and requirements of the Zoning Ordinance.

two feet; we are left to speculate that it did. The only mention in the record that the spacing between sign faces exceeded two feet is in the Board of Municipal and Zoning Appeals Staff Report which states: "The opening between the double faced illuminated signboard varies from approximately 3½ to 18'." From the Board's decision we cannot discern whether they found the Staff Report to be fact or fiction. Moreover, the record is devoid of any explanation as to how the Board's staff arrived at these measurements. Assuming *arguendo* that the Board did rely on the Staff Report to deny the permit, we would still find the decision to be arbitrary, capricious, and illegal.

We seriously doubt the accuracy of the Staff Report's measurements based on the record before us. Appellee argues that "[w]hen measured by a scale ruler, in accordance with the scale noted on the face of the [zoning map] plat, the Board's staff determined that the opening between the signboards varied from approximately three and one half feet to eighteen feet." Upon visual inspection, and without using a ruler, the referenced plat and scale are so patently disproportionate with the superimposed, hand-drawn, and dimensioned sign drawn on the document by Eastern that reasonable minds could not find the scale of the plat to be the scale of the sign drawing. For example, various measurements of the sign and its geographical surroundings were written on the plat by Eastern. The hand-drawn diagram of the billboard depicts a height of 90 feet from the surface of the ground to the top of the billboard. Measured with a ruler, however, and assuming the same scale as the zoning map (1" = 200'), the height would be totally different than the number supplied by Eastern. Using that scale, the height of the billboard would be almost 400 feet, a ridiculous result keeping in mind that it is undisputed that the proposed sign was conceded by all to be only 90 feet. Even the spacing in the hand-drawn diagram between the back-to-back signs does not measure literally 18 feet at its widest point using a 1" = 200' scale (it measures close to 37.5 feet at that scale). These examples substantiate that any measurement of the proposed sign using the zoning

map plat scale would have to be inaccurate and unintended.[18] Without an explanation as to how the Board's staff determined the separation between the back-to-back signs otherwise, its determination that the spacing varied from three and one-half feet to eighteen feet is arbitrary. The Board could not rely on the Staff Report in this regard to substantiate its findings.

## CONCLUSION

As directed by the Court of Appeals in *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 268–72, 734 A.2d 227 (1999), we shall reverse the circuit court's judgment and remand this case to the circuit court with direction that the decision of the Board be reversed and with further direction that the matter be remanded to the Board for further consideration of the record not inconsistent with this opinion.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE DECISION OF THE BOARD OF MUNICIPAL AND ZONING APPEALS OF BALTIMORE CITY AND TO REMAND THE CASE TO THE BOARD FOR FURTHER CONSIDERATION OF THE RECORD NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE CITY.

---

18. Eastern invited this confusion by submitting its drawing of the sign superimposed on a City zoning map excerpt that facially utilized a scale other than that intended by Eastern in its drawing.